## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| DYANIE BERMEO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 3:22-cv-505 |
| vs. | ) | |
| | ) | |
| BLAKE ANDIS, SCOTT SNAPP, | ) | AMENDED COMPLAINT |
| JAMIE BLEVINS, SCOTT ADKINS, | ) | JURY TRIAL DEMANDED |
| and BRAD ROOP, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff DYANIE BERMEO, by and through counsel, Melissa J. Hordichuk, files this Amended Complaint and Jury Demand, against Defendants BLAKE ANDIS, SCOTT SNAPP, JAMIE BLEVINS, SCOTT ADKINS, and BRAD ROOP, in their individual capacities, and by way of claims alleges as follows:

### PRELIMINARY STATEMENT

1.    Plaintiff, a 23-year-old Hispanic woman from Charlotte, North Carolina, was sexually assaulted during an illegal traffic stop in Abingdon, Virginia on September 29, 2020.

2.    At the time of the incident, Plaintiff was a 21-year-old third-year student at King University in Bristol, Tennessee, where she double-majored in criminal justice and psychology.  Plaintiff had a clean driving record and no criminal history.  She aspired to be a law enforcement officer and was in the process of applying for an internship at the Federal Bureau of Investigations (FBI).

3.     On September 30, 2020, Plaintiff reported the sexual assault to local law enforcement in Washington County, Virginia.  After a brief investigation, Defendants from the Washington County Sheriff's Office found no evidence that the stop occurred and determined that Plaintiff was lying.  Defendants coerced Plaintiff into recanting her report that she was sexually assaulted and arrested her for falsely reporting a crime with the intent to mislead law enforcement.

4.     The morning after Plaintiff's arrest, Defendants created a public Facebook post shaming and humiliating Plaintiff for lying to law enforcement about being sexually assaulted.   Defendants included Plaintiff's photo, full name, university, and the name of her residential neighborhood in Charlotte, North Carolina.  The Facebook post was immediately picked up and reported on by several media outlets, including the Charlotte Observer.

5.     After two criminal bench trials in Washington County, Virginia, Plaintiff was finally acquitted on September 13, 2021.

## PARTIES

6.     Plaintiff is a citizen of the State of North Carolina.  At all times relevant hereto, Plaintiff resided in Charlotte, North Carolina; for a period of time relevant hereunder, Plaintiff was an undergraduate student at King University in Bristol, Tennessee.

7.     Defendant BLAKE ANDIS ("ANDIS") is a citizen of the Commonwealth of Virginia, and, at all times relevant hereto, acted under color of state law as the elected Sheriff of the Washington County Sheriff's Office ("WCSO").

8.    Defendant SCOTT SNAPP ("SNAPP") is a citizen of the Commonwealth of Virginia, and, at all times relevant hereto, acted under color of state law as Major Chief Deputy of the WCSO.

9.    Defendant JAMIE BLEVINS ("BLEVINS") is a citizen of the Commonwealth of Virginia, and, at all times relevant hereto, acted under color of state law as Captain of Criminal Investigations for the WCSO.[1]

10.    Defendant SCOTT ADKINS ("ADKINS") is a citizen of the Commonwealth of Virginia, and, at all times relevant hereto, acted under color of state law as a Detective for the WCSO.

11.    Defendant BRAD ROOP ("ROOP") is a citizen of the State of Tennessee, and, at all times relevant hereto, acted under color of state law as a Detective for the WCSO.[2]

## JURISDICTION AND VENUE

12.    This action arises under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and the Civil Rights Act (42 U.S.C. §§ 1983, 1985, and 1988) for damages and other appropriate relief for Defendants' violation of Plaintiff's constitutional and civil rights under color of federal law and the State of North Carolina.

13.    The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1343(a).  The Court has jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

---

[1] Defendant BLEVINS retired from the WCSO on December 20, 2021.
[2] Defendant ROOP left the WCSO and began working as an investigator for the Attorney General of the Commonwealth of Virginia in or around February 2021.

14.    Venue is proper in the Western District of North Carolina pursuant to 28 U.S.C. § 1391(b).

15.    North Carolina's long-arm statute, N.C.G.S. § 1-75.4, is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause.[3]

16.    This Court has personal jurisdiction over the Defendants because the Defendants' efforts to humiliate Plaintiff in a targeted region of North Carolina, far outside the bounds of the Commonwealth of Virginia, were so calculated and deliberate that Defendants had to have anticipated being haled into court here, thereby establishing sufficient minimum contacts to support specific jurisdiction in the forum.

17.    Defendants intentionally directed defamatory social media content disparaging Plaintiff to a North Carolina audience and targeted Plaintiff at home in Charlotte, North Carolina by publicly identifying the small subsection of Charlotte in which Plaintiff resides.  To acquire this information, Defendants had to have made a calculated effort to research Plaintiff's home address and the geographic bounds of the City of Charlotte.  A copy of the Facebook post is attached hereto as **Exhibit A**.

18.    The effectiveness of this targeted attack is substantiated by the subsequent article published by the Charlotte Observer in direct response to Defendants' Facebook post.

---

[3] *See Christian Science Board of Directors of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).

19.     North Carolina has a legitimate interest in protecting its residents from these types of targeted attacks directed within the state.[4]

20.     Furthermore, Plaintiff has grave concerns over the lack of neutrality in the Commonwealth of Virginia.

21.     The Commonwealth failed to provide a court reporter at either of Plaintiff's criminal trials.

22.     Plaintiff requested the Washington County Circuit Court's permission to provide a video court reporter at her second trial, at Plaintiff's expense, because Plaintiff had concerns of bias and prejudice of the tribunal and wanted to exercise her right to a fair and open trial.

23.     The Court waited until the evening before trial to deny Plaintiff's request, leaving Plaintiff without any official court reporter to preserve the record, because the Commonwealth was concerned that its witnesses, all of whom were law enforcement officers, would be intimidated and self-conscious of their testimony, which the Court felt presented a greater risk to fairness.

24.     As a result, Plaintiff's counsel was forced to use her cell phone to make an audio recording of both trials to preserve the record for Plaintiff.

25.     Any inconvenience the Defendants might experience traveling to the forum state is outweighed by fundamental issues of fairness and concerns of bias.  A neutral forum is necessary to protect Plaintiff against further prejudice and to serve the ends of justice.

---

[4] *See Georgia Railroad Bank & Trust Co. v. Eways,* 46 N.C. App. 466, 469 (1980).

## FACTUAL BACKGROUND

### *Plaintiff's Sexual Assault*

26.     At or around 9:30pm on September 29, 2020, Plaintiff was driving from her home in Charlotte, North Carolina to her college campus in Bristol, Tennessee when an unmarked vehicle with blue flashing lights illegally stopped Plaintiff in Abingdon, Virginia, a rural town in the insular homogenous community of Washington County, where the population is 96.6% White.[5]

27.     Plaintiff noticed the vehicle pull out behind her from a side street, where it appeared to have been sitting with its lights off.

28.     After Plaintiff pulled over to the side of the road and stopped her car, a man (hereinafter referred to as, the "Assailant") approached Plaintiff's window, shined a flashlight in her face, and asked Plaintiff if she knew how fast she was driving.  Plaintiff responded saying: "I don't know, sir.  Nothing over 40."  The Assailant ordered Plaintiff to exit the vehicle and threatened to call additional officers for backup if she failed to comply.

29.     Plaintiff complied with the Assailant's order and exited her vehicle, at which time the Assailant spun Plaintiff around and pinned her hands against the driver's side window of Plaintiff's car.  The Assailant proceeded to pat Plaintiff down, touching Plaintiff's breasts and fondling her vagina.  After a few minutes, the Assailant returned to his vehicle, sped past Plaintiff, and turned right at the

---

[5] *See U.S. Census Bureau QuickFacts, Washington County, Virginia*, available at:
https://www.census.gov/quickfacts/washingtoncountyvirginia

nearest intersection, which was approximately five hundred (500) feet from where Plaintiff had parked.

30.    Plaintiff immediately returned to her vehicle and drove directly to campus.  Plaintiff did not mention the assault to anyone until the following day, when she confided in one of her friends (hereinafter referred to as, "Shelby").

### *The WCSO Investigation*

31.    On September 30, 2020, Shelby encouraged Plaintiff to report the incident, but Plaintiff felt uncomfortable going to local law enforcement under the circumstances.  Plaintiff and Shelby sought further guidance from their criminal justice professor, who also encouraged Plaintiff to report the incident.

32.    That afternoon, Shelby initiated the call to the Washington County Sheriff's Office in Abingdon, Virginia and spoke briefly with Sergeant Josh Asbury before giving the phone to Plaintiff to provide additional details.

33.    After gathering sufficient preliminary information to initiate the report, Sgt. Asbury told Plaintiff that a WCSO Detective would contact Plaintiff to schedule an in-person interview.

34.    Later that afternoon, Defendant ADKINS called Plaintiff and asked her to come down to the station for an interview.  Plaintiff arrived with Shelby at WCSO at or around 6:00pm that evening – less than twenty-four (24) hours after Plaintiff's assault.

35.    Under the direct supervision of Defendant SNAPP, Defendants ADKINS and BLEVINS interviewed Plaintiff for approximately fifty (50) minutes

behind the closed door of a private office at the WCSO. Defendants allowed Shelby to sit in the room behind Plaintiff, but they did not question her. Defendant BLEVINS made an audio record of the interview using his iPhone.

36.    At no point did any of the Defendants ask Plaintiff if she was comfortable having the interview without a victim advocate in a closed private office with three (3) male officers.

37.    Defendants ADKINS and BLEVINS focused their questions on determining whether the Assailant was a legitimate law enforcement officer or an individual impersonating law enforcement.

38.    None of the Defendants asked Plaintiff specific questions about the sexual assault. Defendants did not ask if the Assailant made physical contact with Plaintiff beneath her clothing; Defendants did not ask if the Assailant digitally penetrated Plaintiff; Defendants did not take Plaintiff's clothing for evidence; Defendants did not tell Plaintiff she could or should go to a hospital for a sexual assault exam; and Defendants did not examine Plaintiff's vehicle for evidence.

39.    Defendants ADKINS and BLEVINS did ask Plaintiff questions about the location of the stop and descriptions of the Assailant's badge, flashlight, physical appearance, clothing, and vehicle.

40.    Plaintiff was able to note specific details about the Assailant, including: his approximate height and build (6'4" and stocky); his approximate age (30s or 40s); his clothing (gloves, long black pants tucked into law-enforcement-style boots, black dress shirt with long sleeves, and black Kevlar vest); his badge (silver);

and his vehicle (gray older model sedan with rectangular taillights, no license plate, and flashing blue lights across the windshield).

41.    Plaintiff also told Defendants ADKINS, BLEVINS, and SNAPP that the Assailant had a raspy voice with a thick southern accent and sounded like he was chewing tobacco.

42.    At the end of the interview, Defendant ADKINS escorted Plaintiff out of the building.  During this time, Defendants BLEVINS and SNAPP were recorded discussing a named potential suspect who fit Plaintiff's description and had a history of impersonating law enforcement.

43.    For the next two (2) weeks, Defendant ADKINS conducted a brief investigation that entailed surveilling the potential suspect's home with another WCSO Detective and visiting three (3) local gas stations; a car dealership ("Blue Ridge"); and a residential home to obtain security footage.

44.    Defendant ADKINS was able to review recorded video surveillance from a Shell gas station located approximately a mile down the intersecting road onto which the Assailant turned upon leaving the scene.

45.    The Assailant's vehicle was not captured on the gas station's video, which did not contradict Plaintiff's report because there were multiple roads, including a major highway, onto which the Assailant could have turned without ever passing that particular gas station.

46.    Defendant ADKINS did not obtain or review video footage from either of the other gas stations that he testified to visiting.

47.    Defendant ADKINS also called the Blue Ridge car dealership and spoke to one of their offsite security technicians, who Defendant ADKINS claims reviewed their security footage and confirmed that a vehicle matching Plaintiff's 2020 Kia Soul passed by the Blue Ridge dealership at 9:37pm with no other vehicle behind her – thereby corroborating Plaintiff's report.

48.    Defendant ADKINS chose not to review the Blue Ridge video footage himself and relied upon the information that he received from the technician to include in his report.

49.    Defendant ADKINS then obtained video footage from the owner of a residential home located near the stop; however, the video's metadata showed that it was the wrong date and time.

50.    Irrespective of the time period, the quality of the homeowner's video surveillance was so poor that it was impossible to identify any of the vehicles driving past the house on the darkly lit street at night.

51.    Finally, Defendant ADKINS and another WCSO Detective sat outside their potential suspect's house to observe if a vehicle matching Plaintiff's description of the one driven by the Assailant appeared on the property.

52.    After two (2) visits to the house and no sighting of a similar vehicle, Defendant ADKINS ruled out this individual as a person of interest.

53.    Defendant ADKINS failed to include any details to suggest that there was ever a potential suspect or person of interest in his official investigative report. This information only came to light when Plaintiff's counsel obtained the audio

recording of Plaintiff's first interview and subsequently questioned Defendant ADKINS on direct examination at trial.

54.    In his investigative report, Defendant ADKINS claims that multiple agencies assisted in the investigation, including the Town of Abingdon and the Virginia State Police; however, when Plaintiff's attorney contacted these agencies, representatives from both agencies stated that they received a BOLO[6] from the WCSO on the Assailant's vehicle but did not actively participate in any part of the investigation.

55.    Defendant ADKINS did not go to the crime scene to look for evidence (e.g., possible DNA left behind from the Assailant's spitting tobacco, tire tracks, etc.); Defendant ADKINS did not examine Plaintiff's vehicle for evidence; Defendant ADKINS did not collect Plaintiff's clothing; Defendant ADKINS did not interview the neighboring houses on the street where the incident occurred or on the street where Plaintiff said the Assailant's car had been sitting before pulling out to follow her; and Defendant ADKINS did not interview their only potential suspect.

56.    At this point in the investigation, Defendant ADKINS consulted with Defendant ROOP before asking Plaintiff to return to the WCSO station for some additional questioning.

57.    On Tuesday, October 13, 2020, at or around 8:30am, Plaintiff returned to the WCSO to meet with Defendants ADKINS and ROOP.  They proceeded to ask

---

[6] An instruction to law enforcement agencies to "Be On The Lookout" for a suspected criminal or criminal activity.

Plaintiff questions about the Assailant's vehicle, badge, and clothing while showing her reference photos of different cars, badges, and uniforms.

58.    Defendants ADKINS and ROOP then asked Plaintiff if she would be willing to accompany them to the scene of the incident to see if it would help her recollect additional details.  Plaintiff agreed, and Defendants ADKINS and ROOP instructed Plaintiff to leave her phone, keys, and wallet at the WCSO, which she did.

59.    As Defendants ADKINS and ROOP drove past the residential house from which they had already obtained video surveillance, they falsely represented to Plaintiff that they were still working on getting the video from the owner. Defendants ADKINS and ROOP told Plaintiff that they were confident they would be able to identify the Assailant's vehicle from the video once they obtained a copy.

60.    During this time, Defendants ADKINS and ROOP reportedly observed some of Plaintiff's body language and breathing patterns and found them to be "suspicious," which Defendant ADKINS noted in his investigative report.

61.    Based on Plaintiff's "suspicious" behavior and Defendants' lack of evidence, Defendants ADKINS and ROOP jointly concluded that Plaintiff was lying about the stop and the sexual assault.  It was at this point, as Defendant ADKINS testified at trial, that Plaintiff became a "suspect" of false reporting.

62.    When Defendants ADKINS and ROOP returned to the station with Plaintiff, Plaintiff retrieved her personal belongings and drove back to campus.

63.     Shortly thereafter, at 11:01am, Plaintiff received a series of four (4) text messages from an unknown number stating: (1) "They won't find anything"; (2) "They will not find anything.  U should have never gone to police"; (3) "Just know that I know where U live….where U work… everything… I would reconsider"; and (4) "Tell the police u changed ur mind and I will leave u alone… if not I won't go for you… just know that."

64.     At the time she received the messages, Plaintiff had been in the dormitories on campus with a friend waiting for her next class to begin.

65.     When Plaintiff saw the messages, she immediately called her father. Plaintiff's father tried calling the number, but it rang back to Plaintiff's device.  He told Plaintiff she needed to contact the Detectives handling her case as soon as possible.

66.     Plaintiff reached out to Defendant ADKINS, and Defendant ADKINS told Plaintiff that he and Defendant ROOP would drive out to Plaintiff's college campus in Bristol, Tennessee to look at the messages on her phone.

67.     Approximately an hour later, Defendants ADKINS and ROOP crossed the state line into Tennessee and arrived on Plaintiff's campus with a preconceived plan to coerce and secretly record a confession from Plaintiff.  Defendants had already decided that Plaintiff sent the text messages to herself for attention.

68.     Defendants ADKINS and ROOP proceeded to interrogate Plaintiff on King University campus for approximately twenty-four (24) minutes.

69.    Defendants began by briefly discussing Plaintiff's phone.  Defendant ADKINS told Plaintiff that there are downloadable apps that could be installed to set up this type of text messaging and that they could take and "dump" Plaintiff's phone to find the originating device.

70.    After a few minutes, Defendant ROOP shifted the focus of their questioning onto the video surveillance from the residential home near the stop.

71.    Defendant ROOP asked Plaintiff if there was any reason why the video would *not* show a traffic stop – to which Plaintiff responded by shaking her head, indicating "no."

72.    Defendant ROOP then disclosed to Plaintiff that he and Defendant ADKINS had already obtained and watched the video; however, Defendant ROOP proceeded to affirmatively distort the truth by telling Plaintiff that they saw her car in the video, and no one was behind her.

73.    Defendants ROOP and ADKINS told Plaintiff that she was digging herself into "a deeper hole" and they did not want to "embarrass" her.

74.    Defendant ROOP said to Plaintiff: "We need you to keep it between us, but we need you to tell us the truth…no stop happened here."

75.    In response, Plaintiff made an audible noise indicating agreement with Defendant ROOP.

76.    Defendant ROOP asked Plaintiff why she would make this up, and Plaintiff replied, "I don't know."

77.    Defendants ROOP and ADKINS proceeded to ask Plaintiff questions about her mental health and personal life to portray Plaintiff as mentally and emotionally unstable.

78.    Defendant ROOP asked Plaintiff how she sent the text messages to herself, and Plaintiff replied, "there's an app."

79.    Once Defendants ROOP and ADKINS had what they perceived to be a recorded confession, they thanked Plaintiff for her honesty and assured Plaintiff that they would not tell anyone else about the incident.   Defendant ROOP told Plaintiff that she needed to "keep quiet" to avoid embarrassment.

80.    After they concluded their interrogation, Defendants ROOP and ADKINS went to speak privately with Benny Berry, the Director of Safety and Security at King University, to whom they relayed Plaintiff's "confession" of lying to law enforcement about being sexually assaulted off campus.

81.    The following day, on October 14, 2020, Mr. Berry contacted Plaintiff to advise her that the false report was a violation of King University's student conduct policy, and, as a result, Plaintiff was facing expulsion and would be subject to an official investigation and disciplinary proceeding.

82.    On October 15, 2020, Defendant ADKINS left Plaintiff a voicemail asking her to come down to the station to close out the case.

83.    Plaintiff arrived at the WCSO that same afternoon, at which point, Defendant ADKINS arrested Plaintiff for knowingly filing a false report as to the commission of a crime with the intent to mislead law enforcement, a Class 1

criminal misdemeanor in Virginia punishable by up to one (1) year in jail under Virginia Code § 18.2-461.

84.    Defendant ADKINS told Plaintiff he did not want to arrest her, but that his "hands were tied" because he received direct orders from Defendant ANDIS.

85.    As Plaintiff was getting fingerprinted and photographed for her mug shot, Defendant ADKINS used his cell phone to take a separate personal photo of Plaintiff.

86.    The following morning, on October 16, 2020, Defendants used Defendant ADKINS' personal photo of Plaintiff to create a public Facebook post defaming Plaintiff for lying to law enforcement about being sexually assaulted. Defendants disclosed Plaintiff's full name, University, and the name of her residential neighborhood in Charlotte, North Carolina.

87.    In response to Defendants' Facebook post, Plaintiff received hundreds of cruel and hurtful messages on social media, many telling her to kill herself, that she belongs in jail, and that no one would ever sexually assault someone who looks like Plaintiff.  One person wrote: "Based on her picture alone, she only wishes that someone would sexually assault her. No one in their right mind would even consider it."

88.    Numerous media outlets, including the Charlotte Observer, picked up and reported on Defendants' Facebook post, thereby perpetuating the defamation and causing further injury to Plaintiff.

16

89.     The extreme mental and emotional distress caused by Defendants' viral social media post led Plaintiff to have suicidal ideations.

*Jane Doe*

90.     On June 10, 2021, a 26-year-old White woman from Bristol, Virginia (hereinafter referred to as "Jane Doe") reported to the WCSO that an unmarked vehicle had pulled her over and that a man, who appeared to be approximately 6'1" and in his mid 30s, handcuffed her and inappropriately patted her down before letting her go.

91.     After a brief investigation, which consisted primarily of obtaining and reviewing local video surveillance, the investigating officer contacted Jane Doe and asked her to come down to the WCSO station on June 21, 2021. Jane Doe expressed hesitation and told the officer that the case was making her uneasy, but she agreed to go to the station that afternoon.

92.     About an hour later, Jane Doe called to say she felt uncomfortable going to the sheriff's office and would not be keeping her appointment.

93.     Two (2) WCSO officers immediately went out to find Jane Doe, and, after locating her at her mother's house, secured a confession that Jane Doe lied about the traffic stop.

94.     On June 28, 2021, the WCSO arrested Jane Doe for filing a false report. They prosecuted her on August 3, 2021 and sentenced Jane Doe to thirty (30) days in jail, suspended twelve (12) months on the condition of good behavior.

95.    At no point in time did Defendants publicize Jane Doe's arrest or prosecution on social media.

*Plaintiff's Criminal Trials*

96.    Plaintiff's first criminal bench trial was held before Judge Eric Thiessen in Washington County District Court on March 22, 2021.  Plaintiff lost and was sentenced to ninety (90) days in jail, suspended twelve (12) months on the condition of good behavior.  Plaintiff appealed and was granted a *de novo* trial in Washington County Circuit Court.

97.    On August 26, 2021, Plaintiff appeared before Judge Sage Johnson in Washington County Circuit Court for her second bench trial, and, on September 13, 2021, Judge Johnson signed an order acquitting Plaintiff of falsely reporting a crime with the intent to mislead law enforcement.

98.    During Plaintiff's second trial, Defendants acknowledged the existence of a Sexual Assault Response Policy ordered and approved by Defendant ANDIS, effective January 1, 2020.  A copy of this policy, otherwise known as General Order Number 2-40, is attached hereto as **Exhibit B**.

99.    Plaintiff's counsel also questioned Defendants on the existence of a special "V-STOP Detective" at WCSO, who is tasked with thoroughly investigating all WCSO sexual assault reports and whose salary is paid for with federal funding through the Violence Against Women Act (VAWA), which is annually distributed to WCSO through the Virginia Department of Criminal Justice Services (DCJS).

100.    Based on Defendants' testimony at trial, the V-STOP Detective, Stephen Reed, was not consulted or involved in Plaintiff's case at any point in time.

### *Plaintiff's Damages*

101.    As a result of the arrest, viral social media attack, and year-long legal battle to clear her name, Plaintiff has suffered irreparable harm to her mental health and emotional well-being, which has only compounded the underlying trauma of her sexual assault.

102.    Plaintiff has been diagnosed with post-traumatic stress disorder; she has had recurrent nightmares, panic attacks, suicidal ideations, and debilitating anxiety.

103.    Plaintiff was ostracized on campus, her grades suffered, and she was forced to finish most of her coursework remotely off campus.

104.    But for the intervention of Plaintiff's attorney, Plaintiff would have likely been expelled from King University before graduating.

105.    Plaintiff lost friendships and her stigmatized reputation tarnished her personal and professional relationships at school.

106.    Plaintiff lost her part-time job at Outback Steakhouse, and she lost the opportunity to intern at the FBI because of her criminal record.

107.    This experience fundamentally changed Plaintiff's view of the criminal justice system and has completely derailed the trajectory of Plaintiff's career in law enforcement.   In one fell swoop, Defendants destroyed Plaintiff's bright future,

caused her immense mental and emotional trauma, and robbed Plaintiff of her lifelong dream of being a police officer.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Unlawful Seizure in Violation of the Fourth Amendment**
**(Defendants Andis and Adkins)**

108.   Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

109.   Defendants ANDIS and ADKINS knowingly arrested Plaintiff without probable cause for falsely reporting the commission of a crime with the intent to mislead law enforcement.

110.   No reasonable, competent officer would believe that Plaintiff falsely reported her sexual assault with the intent to mislead law enforcement based on a secretly recorded, un-Mirandized recantation, which Defendants themselves unlawfully coerced from Plaintiff in another state outside of their jurisdiction.

111.   Moreover, Defendant ADKINS knowingly and intentionally made false statements and omitted material facts from his official investigative report, thereby demonstrating a willingness to affirmatively distort the truth for the purpose of manufacturing probable cause on the record.

112.   Without probable cause, Plaintiff's arrest amounted to an unlawful seizure in violation of the Fourth Amendment of the United States Constitution.

113.    This unlawful seizure caused irreparable harm to Plaintiff's mental and emotional well-being, career prospects, education, reputation, and relationships.

114.    Defendants ANDIS and ADKINS were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

115.    Accordingly, Defendants ANDIS and ADKINS are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983
### Malicious Prosecution in Violation of the Fourth Amendment
### (Defendants Andis and Adkins)

116.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

117.    Defendants ANDIS and ADKINS arrested Plaintiff and commenced a year-long criminal proceeding against Plaintiff without probable cause and with malice and an intention to cause Plaintiff harm.

118.    Plaintiff's prosecution terminated in an acquittal.

119.    Defendants' malicious prosecution violated Plaintiff's Fourth Amendment rights and caused irreparable harm to Plaintiff's mental and emotional well-being, career prospects, education, reputation, and relationships.

120.    Defendants ANDIS and ADKINS were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

121.    Accordingly, Defendants ANDIS and ADKINS are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983
### Violation of Fifth Amendment Right Against Self-Incrimination
### (Defendants Adkins and Roop)

122.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

123.    Defendants ADKINS and ROOP left the Commonwealth of Virginia and drove to Plaintiff's college campus in Bristol, Tennessee to question Plaintiff as a suspect without disclosing to Plaintiff that she was being treated and questioned as a suspect.

124.    Defendants made false representations and affirmatively distorted the truth about evidence to coerce Plaintiff into recanting her report of sexual assault, which Defendants secretly recorded for the purpose of maliciously prosecuting Plaintiff.

125.    In doing so, Defendants ADKINS and ROOP violated Plaintiff's Fifth Amendment right against self-incrimination and caused irreparable harm to

Plaintiff's mental and emotional well-being, career prospects, education, reputation, and relationships.

126.    Defendants ADKINS and ROOP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

127.    Accordingly, Defendants ADKINS and ROOP are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Deprivation of Liberty in Violation of Fourteenth Amendment Due Process**
**(All Defendants)**

128.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

129.    When Defendants arrested and prosecuted Plaintiff without probable cause, they altered Plaintiff's legal status as a law-abiding citizen by imputing to her an arrest record and criminal history that consequently foreclosed all of Plaintiff's future career opportunities in law enforcement.

130.    Defendants further injured Plaintiff by unnecessarily disclosing this information to the Director of Safety and Security at King University and by publicly shaming and humiliating Plaintiff on social media – neither of which had any legitimate law enforcement purpose.

131.   As a result, Plaintiff lost her opportunity to intern with the FBI; she was nearly expelled from King University; Plaintiff was forced to finish most of her coursework remotely; her grades suffered; and the trauma of Plaintiff's sexual assault was compounded tenfold.

132.   Plaintiff's altered legal status, stigmatized reputation, and all the injuries resulting therefrom were tantamount to a deprivation of liberty under the Fourteenth Amendment, thereby justifying an invocation of procedural due process safeguards.

133.   Defendants did not afford Plaintiff a right to be heard; they continued to condemn and stigmatize her without due process, thereby causing irreparable harm to Plaintiff's mental and emotional well-being, career prospects, education, reputation, and relationships.

134.   Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

135.   Accordingly, Defendants are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Violation of Right to Equal Protection Under the Fourteenth Amendment**
**(All Defendants)**

136.   Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

137.   At all times relevant herein, Plaintiff had a right to equal protection under the law as afforded and provided by the Fourteenth Amendment of the United States Constitution.

138.   Defendants discriminated against Plaintiff on the basis of her race by creating a targeted social media post with Plaintiff's photo, full name, college, and residential neighborhood to publicly shame and humiliate Plaintiff after her arrest.

139.   Approximately eight (8) months later, Jane Doe, a similarly situated Non-Hispanic White woman, was arrested by the WCSO and prosecuted for falsely reporting a strikingly similar narrative.

140.   Despite the fact that Jane Doe accepted a plea bargain and effectively pled guilty to false reporting, Defendants refrained from publicly shaming and humiliating Jane Doe.

141.   By selectively defaming Plaintiff, a Hispanic outsider in a predominately White rural county, Defendants violated Plaintiff's Fourteenth Amendment right to equal protection and caused irreparable harm to Plaintiff's mental and emotional well-being, career prospects, education, reputation, and relationships.

142.   Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a

careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

143. Accordingly, Defendants are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

## SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Failure to Intervene
### (All Defendants)

144. Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

145. Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP were present for and/or had knowledge of ongoing constitutional violations by at least one of their fellow Defendant officers.

146. Each Defendant had a reasonable opportunity to prevent the harm caused to Plaintiff by their fellow officers; however, each of these Defendants chose not to intervene, thereby compounding Plaintiff's harm.

147. Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

148. Accordingly, Defendants are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

## SEVENTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Failure to Supervise
### (Defendants Andis and Snapp)

149.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

150.    Defendants ANDIS' and SNAPP's failure to supervise amounted to deliberate indifference to Plaintiff's constitutional rights.

151.    At the beginning of 2020, Defendant ANDIS issued a directive to all WCSO officers providing twenty-one (21) pages of guidance on how officers should respond to reports of sexual assault. In the opening paragraph of this policy, Defendant ANDIS states: "Because of the seriousness of these offenses and the delicate nature of the investigations involved, it is important for the [Sheriff's] Office to undertake diligent investigations in order to increase the reporting of these crimes." *See* **Exhibit B**.

152.    In issuing this policy, Defendant ANDIS demonstrated his express awareness of the sensitive nature of sexual assault investigations and the need for such investigations to be performed in a trained and methodical matter.

153.    Nevertheless, Defendants ANDIS and SNAPP deliberately disregarded this policy while supervising the investigations of Plaintiff's and Jane Doe's sexual assaults. In less than a year, both women reported a similar account of being illegally stopped and sexually assaulted by a man holding himself out to be a law enforcement officer.

154.    Yet despite the fact that there was no evidence proving that these sexual assaults did not occur, both women were arrested and prosecuted for false reporting in violation of their constitutional rights protected by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

155.    Defendants ANDIS and SNAPP demonstrated deliberate indifference by failing to implement their Sexual Assault Response Policy; knowing that in doing so, Defendants were actively violating Plaintiff's constitutional rights and sending a broader chilling message that women who report their sexual assaults will also run the risk of getting prosecuted and jailed.

156.    Defendants ANDIS and SNAPP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

157.    Accordingly, Defendants are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

### EIGHTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Failure to Train
### (Defendants Andis & Snapp)

158.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

159.    Defendants ANDIS and SNAPP failed to implement and train Defendants BLEVINS, ADKINS, and ROOP on their Sexual Assault Response

Policy, which they knew directly resulted in a violation of Plaintiff's constitutional rights. (*See* **Exhibit B**).

160. Had Defendants ANDIS and SNAPP implemented and trained Defendants BLEVINS, ADKINS, and ROOP on their own Sexual Assault Response Policy, Defendants would have: encouraged Plaintiff to go to the hospital for a sexual assault exam; met Plaintiff at the hospital instead of in a private room at the WCSO with three (3) male officers; referred Plaintiff to a sexual assault crisis center; given Plaintiff an opportunity to decide whether she wanted police intervention; asked Plaintiff if she wanted a victim advocate present; collected and preserved evidence; informed Plaintiff of and referred Plaintiff to counseling services; alerted their local victim/witness assistance program; and, most importantly, Defendants would not have coerced Plaintiff into recanting, and they would not have arrested or prosecuted her.

161. In other words, had Defendants ANDIS and SNAPP followed their own internal policy and trained their officers to do the same, Defendants would not have violated Plaintiff's constitutional rights.

162. Moreover, Defendants ANDIS and SNAPP failed to utilize their special VAWA-funded "V-STOP Detective" in Plaintiff's investigation – the one WCSO officer properly trained and specifically tasked with overseeing sexual assault cases.

163. Defendants' deliberate indifference is substantiated by the fact that, eight (8) months after they arrested Plaintiff, Defendants ANDIS and SNAPP again knowingly and deliberately disregarded their Sexual Assault Response Policy in

responding to Jane Doe's report, and they again failed to consult or involve their V-STOP Detective, Stephen Reed.

164.   Defendants ANDIS and SNAPP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages against individual Defendant Sheriff ANDIS.

165.   Accordingly, Defendants are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

### NINTH CAUSE OF ACTION
### 42 U.S.C. §§ 1983, 1985
### Conspiracy to Interfere with Plaintiff's Civil Rights
### (All Defendants)

166.   Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

167.   Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP all conspired to violate Plaintiff's constitutional rights and deprive Plaintiff of equal protection under the law by agreeing to work complicitly in treating Plaintiff as a suspect; interrogating her; coercing Plaintiff into recanting her sexual assault; and arresting, prosecuting, and publicly humiliating her on social media.

168.   Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

169.    Accordingly, Defendants are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

## TENTH CAUSE OF ACTION
### North Carolina State Law
### Invasion of Privacy Based on Intrusion into Seclusion
### (All Defendants)

170.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

171.    Without any legitimate law enforcement justification, Defendants ADKINS and ROOP intentionally invaded Plaintiff's private life and reported to the Director of Safety and Security at King University, a college located in another state outside of Defendants' jurisdiction, that Plaintiff lied to law enforcement officers in Virginia about being sexually assaulted off campus.

172.    A few days later, Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP used Plaintiff's private information to create a public Facebook post for the sole purpose of distressing, shaming, and humiliating her – also without any legitimate law enforcement justification.

173.    Defendants' actions were an intentional intrusion upon Plaintiff's solitude and seclusion and were unquestionably offensive to a reasonable person.

174.    As a result, Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP caused Plaintiff significant mental anguish and caused irreparable harm to Plaintiff's mental and emotional well-being, career prospects, education, reputation, and relationships.

175.    Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

176.    Accordingly, Defendants are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

### ELEVENTH CAUSE OF ACTION
### North Carolina State Law
### Intentional Infliction of Emotional Distress
### (All Defendants)

177.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

178.    Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP exhibited extreme and outrageous conduct by leaving their jurisdiction and crossing the state line to interrogate and coerce Plaintiff into recanting her report of sexual assault, which they proceeded to use to destroy Plaintiff's reputation and career – first by involving King University, then by arresting and prosecuting Plaintiff, and finally, by publicly shaming and humiliating Plaintiff on social media.

179.    Defendants had no legitimate law enforcement justifications for any of their extreme and outrageous conduct.

180.    Defendants intended to and did in fact cause Plaintiff severe emotional distress by causing irreparable harm to Plaintiff's mental and emotional well-being, career prospects, education, reputation, and relationships.

181.    Defendants ANDIS, SNAPP, BLEVINS, ADKINS, and ROOP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

182.    Accordingly, Defendants are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

**TWELVETH CAUSE OF ACTION**
**North Carolina State Law**
**Fraud**
**(Defendants Adkins and Roop)**

183.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

184.    Defendants ADKINS and ROOP intentionally misrepresented and concealed a material fact by lying to Plaintiff about video evidence to manipulate and coerce her into recanting her report so that they could arrest and prosecute Plaintiff for filing a false report with the intent to mislead law enforcement.

185.    Defendants' false representation was reasonably calculated to deceive Plaintiff and did in fact deceive Plaintiff, thereby resulting in damages.

186.    Defendants ADKINS and ROOP were the direct and proximate cause of Plaintiff's injuries, and their actions constitute a careless and reckless disregard for Plaintiff's civil and constitutional rights, thereby entitling Plaintiff to an award of punitive damages.

187.    Accordingly, Defendants ADKINS, and ROOP are liable to Plaintiff for compensatory damages, punitive damages, costs, and attorney's fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order against Defendants as follows:

1.    Awarding Plaintiff general compensatory damages for past, present, and future pain, suffering, anxiety, discomfort, embarrassment, humiliation, emotional harm, mental anguish, loss of sleep, and panic attacks; past, present, and future lost wages, earning capacity, and the reasonable value of her working time; past, present, and future reputational harm; the reasonable value of medical care and supplies; and the reasonable value of the legal services that she needed and obtained to defend the criminal action instituted by Defendants;

2.    Awarding Plaintiff punitive damages for conduct that was intentional, reckless, malicious, and/or callously indifferent to Plaintiff's protected rights;

3.    Awarding Plaintiff pre- and post-judgment interest; and

4.    Awarding Plaintiff attorney's fees, costs, witness fees, and any other further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: October 6, 2022

Respectfully submitted,

*/s/ Melissa J. Hordichuk*
**MELISSA J. HORDICHUK**
NC Bar ID: 56012
Access to Justice Project
P.O. Box 680783
Charlotte, NC 28216
Telephone: (704) 727-2997
Facsimile: (704) 559-3606
Email: melissa.hordichuk@accessjustice.org
Counsel for Plaintiff