**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
8/16/2024
LAURA A. AUSTIN, CLERK
BY: s/C Kemp
DEPUTY CLERK

| | |
|---|---|
| **DYANIE BERMEO,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 1:23-cv-041** |
| ) | |
| **v.** ) | **By:   Michael F. Urbanski** |
| ) | **Senior United States District Judge** |
| **BLAKE ANDIS et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

This matter comes before the court on defendants' motion to dismiss plaintiff Dyanie Bermeo's Second Amended Complaint. ECF No. 63. The court held oral arguments on the motion on March 14, 2024. For the reasons stated below, the motion is **GRANTED**.

### I.

Bermeo brings this action against defendants Blake Andis, Jamie Blevins, Scott Adkins, and Brad Roop to recover for alleged constitutional violations and tortious conduct committed against Bermeo after she reported that she had been sexually assaulted during a traffic stop in Abingdon, Virginia. At the time relevant to this case, Andis was the elected Sheriff of Washington County, Second Am. Compl., ECF No. 61, ¶ 10, Blevins was the Captain of Criminal Investigations with the Washington County Sheriff's Office ("WCSO"), id. ¶ 11, and Adkins and Roop were detectives with the WCSO, id. ¶¶ 12–13. Bermeo was a 21-year-old undergraduate student at King University in Bristol, Tennessee, pursuing a double major in criminal justice and psychology. Id. ¶ 2. She "aspired to be a federal law enforcement officer

1

and was in the process of applying for an internship at the Federal Bureau of Investigation[]"

when the events giving rise to this case occurred. Id.

On September 30, 2020, Bermeo contacted the WCSO to report that she had been

sexually assaulted the previous day by a law enforcement officer. Id. ¶¶ 23–25. At Adkins'

request, Bermeo went to the WCSO station that evening, at which point she told Adkins,

Blevins, and Major Scott Snapp[1] about the assault. Id. ¶ 27. Bermeo informed the officers that

she had been traveling from her home in Charlotte, North Carolina to King University on

September 29, 2020, when she was sexually assaulted during a traffic stop on Old Jonesboro

Road in Abingdon, Virginia. Id. ¶ 17. She told the WCSO detectives that an unmarked vehicle

pulled onto the road and began to follow Bermeo around Windsor Lane in Abingdon. Id. ¶ 18.

Bermeo stated that she had observed blue flashing lights in her rear-view mirror, so she pulled

over to the side of the road and stopped her car, at which time a man approached her vehicle,

asked if she knew how fast she had been going, and ordered her to exit the vehicle. Id. ¶¶ 17–

19. Bermeo told the officers that the man had "threatened to call additional officers for backup

if she failed to comply." Id.

Bermeo said that she exited the vehicle, "at which time the Assailant spun [Bermeo]

around and pinned her hands against the driver's side window of [Bermeo's] car . . . [and]

proceeded to pat [Bermeo] down, touch [her] breasts, and fondle her vagina." Id. ¶ 20. She

told the detectives that the man then returned to his car, drove past Bermeo, and turned right

---

[1] Bermeo originally named Snapp as a defendant but voluntarily dismissed her claims against him earlier in the litigation. See ECF No. 25.

onto Spring Creek Road just ahead of where Bermeo was stopped. Id. Bermeo stated that she then returned to her car and drove to King University. Id. ¶ 21.

Adkins and Blevins, who recorded the interview,[2] "focused their questions on determining whether the Assailant was a legitimate law enforcement officer or an individual impersonating law enforcement." Id. ¶ 29. Bermeo informed the officers that the man was 6'4"; stocky; 30 to 40 years old; wearing "gloves, long black pants tucked into law-enforcement-style boots, black dress shirt with long sleeves, and black Kevlar vest"; displaying a silver badge and driving a "gray older model sedan with rectangular taillights, no license plate, and flashing blue lights across the windshield." Id. ¶ 32. Bermeo also drew a picture of the man's car. Id. ¶ 33. At the conclusion of the interview, Adkins escorted Bermeo out of the building. Id. ¶ 35. After Bermeo left the room, Blevins and Snapp "were recorded discussing a named potential suspect who fit the Assailant's physical description and had a history of impersonating law enforcement." Id.

Adkins spent the next two weeks investigating Bermeo's allegations. Id. ¶¶ 36–47. Adkins reviewed video surveillance from a nearby Shell gas station on Lee Highway and did not see vehicles matching Bermeo's description. Id. at ¶ 37. He spoke with a security technician for the nearby Blue Ridge Chrysler Dodge Jeep Ram car dealership, located approximately one mile north of the area in which Bermeo was assaulted, who informed Adkins that video surveillance footage from September 29, 2020, showed Bermeo's vehicle traveling past the dealership at 9:37 p.m. without a trailing car. Id. ¶ 39. Adkins reviewed poor-quality video footage recorded by a homeowner on Old Jonesboro Road, however that

---

[2] The parties did not provide this recording to the court.

footage was recorded on a date different from the date of the assault. Id. ¶ 41. During this period, Adkins also "sat outside their potential suspect's house to observe if a vehicle matching the description of the Assailant's appeared on the property." Id. ¶ 43. Adkins twice visited the property and, finding no similar vehicle, "ruled out this individual as a person of interest." Id. ¶ 44. Adkins never interviewed the potential suspect, nor did Adkins go to the crime scene or interview residents of the area. Id. ¶ 47.

Bermeo returned to the WCSO station on October 13, 2020, again at Adkins' request, to answer more questions about the man's appearance the evening of the assault. Id. ¶¶ 48–49. Detective Roop was also present for this second interview. Id. ¶ 49. Adkins and Roop asked Bermeo to accompany them to the location where Bermeo alleged she was assaulted, which Bermeo agreed to do. Id. ¶ 50. Before they departed the station, Adkins and Roop "instructed [Bermeo] to leave her phone, keys, and wallet at the WCSO station, which she did." Id. at ¶ 50. Bermeo then traveled with the officers to the site. Id. ¶ 51. Bermeo alleges that as she and the officers passed the house whose owner had provided Adkins with the poor-quality video footage from the wrong date, the officers "falsely represented to [Bermeo] that they were still working on getting the video from the owner." Id. at ¶ 51. By that time, however, Adkins had already obtained and reviewed the recording. Id. On the way back to the station, Bermeo alleges that "Adkins and Roop reportedly observed some of [Bermeo's] body language and breathing patterns and found them to be 'suspicious.'" Id. at ¶ 52. Bermeo retrieved her belongings from the WCSO station and returned to King University. Id. at ¶ 54.

Later that same day, Bermeo contacted Adkins to inform him that she had received several texts from an unknown number regarding her allegations and interactions with law

enforcement. <u>Id.</u> ¶ 55. These texts stated "'(1) [t]hey won't find anything'; (2) '[t]hey will not find anything. U should have never gone to police'; (3) '[j]ust know that I know where U live . . . . where U work . . . . everything . . . . I would reconsider;' and (4) '[t]ell the police u changed ur mind and I will leave u alone . . . if not I won't go for you . . . just know that.'" <u>Id.</u> Bermeo told Adkins that she had called her father about the messages, who had tried to call the phone number associated with the text messages. <u>Id.</u> ¶ 57. When he called the number, however, it was Bermeo's phone that rang. <u>Id.</u>

Adkins and Roop drove to King University in Bristol, Tennessee, to view the messages on Bermeo's phone. <u>Id.</u> ¶ 59. Plaintiff alleges that they did so "with a preconceived plan to use fabricated evidence and veiled threats to coerce [Bermeo] into an involuntary false confession, which they also planned to secretly record."[3] <u>Id.</u>

When the officers met with Bermeo on King University's campus, Bermeo called the number and it rang back to her cell phone. <u>See</u> ECF No. 51-1. Adkins informed Bermeo that "there are downloadable apps that could be installed to set up this type of text messaging," and that they could analyze Bermeo's phone to determine the messages' origin. Second Am. Compl., ECF No. 61, ¶ 61. Bermeo asked if the analysis could show that the messages came from her phone, and Adkins replied that, if Bermeo had sent the messages, then the analysis would identify her phone as the sender. <u>See</u> ECF No. 51-1. He also explained that the traffic

---

[3] Defendants attached a copy of this recording to their memorandum in support of the motion to dismiss. <u>See</u> ECF No. 51-1. The court will rely upon the recording because Bermeo discusses and quotes its contents in the Complaint. <u>See</u> Second Am. Compl., ECF No. 61, ¶¶ 60–73; <u>see also</u> <u>Barbour v. Garland</u>, 105 F.4th 579, 585 n.2 (4th Cir. 2024) (relying on a document attached to a defendant's memorandum in support of its motion to dismiss "because it is integral to and explicitly relied upon in the Complaint and its authenticity has not been challenged").

stop had seemed random but that the text messages appeared more targeted, as if the assailant had concrete information about the status of the WCSO's investigation. Id.

Roop asked Bermeo whether the surveillance video would reveal that no stop had occurred, implying that the officers had not yet reviewed the footage. Id. Bermeo did not reply. Id. Later in the conversation, Roop told Bermeo that they had already reviewed the surveillance video and that it showed that Bermeo had driven by without anyone following her. Id. Roop asked Bermeo if a stop had happened, and Bermeo replied that no stop had occurred. Id. She also confirmed that she had used an application to send the text messages and that any analysis would identify her phone as the sender. Id. The officers informed her that they were concerned about her wellbeing, at which point Bermeo explained that she had been struggling with her mental health. Id. The officers recommended that she speak to a counselor and asked how they could help her, to which Bermeo replied that she needed to see a new counselor. Id. Roop told Bermeo that he would put her in contact with several counselors he knew in the area. Id. Adkins told Bermeo that he would close the police report and that he would not share the events that had transpired with anyone other than his supervisor and King University's security personnel. Id. At the end of the conversation, Bermeo told the officers that she appreciated their work and that she was sorry. Id.

Bermeo quickly faced backlash from King University security personnel and the WCSO. The next day, October 14, 2020, Director of Safety and Security at King University Benny Berry informed Bermeo that she could face expulsion because her false report violated King University's code of conduct. Second Am. Compl., ECF No. 61, ¶ 80. Berry told Bermeo that she would be subject to an official investigation and disciplinary proceeding. Id. That

6

same day, Sheriff Andis "ordered Adkins to use the involuntary 'confession' . . . as probable cause to obtain a warrant to arrest [Bermeo] for knowingly filing a false police report with the intent to mislead law enforcement." Id. ¶ 81.

On October 15, 2020, Adkins left Bermeo a voicemail to return to the WCSO station "so they could close out the case." Id. ¶ 89. Bermeo went to the station, where Adkins placed Bermeo under arrest for filing a false police report with the intent to mislead law enforcement. Id. ¶ 90. "Adkins told [Bermeo] that he allegedly did not want to arrest her, but that his 'hands were tied' because he received direct orders from Sheriff Andis." Id. ¶ 91. Adkins held Bermeo at the station for several hours. Id. ¶ 92. She was fingerprinted and had her photograph taken for a mugshot. Id. ¶ 93. Adkins also "used his cell phone to take a separate personal photo of [Bermeo]." Id.

On the morning of October 16, 2020, the WCSO posted a press release on Facebook containing Bermeo's "full name, university, and the precise section of Charlotte, North Carolina where she resides, and the photo Adkins took of [Bermeo] during her arrest." Id. ¶¶ 96, 103. The release states in full:

> On September 30, 2020[,] the Washington County, Virginia Sheriff's Office received a report from Dyanie Bermeo, a female student at King University, stating that a law enforcement officer or a person impersonating a law enforcement officer during a traffic stop had sexually assaulted her. The incident was alleged to have happened at the intersection of Old Jonesboro Road and Spring Creek Road on September 29, 2020.
>
> Considering the dangerous nature of this report the Washington[] County Sheriff's Office with assistance from the Abingdon Police Department and Virginia State Police[] conducted a full-scale investigation. In addition, Bermeo reported this incident to the Faculty at King University, which prompted the University to distribute a safety bulletin to their students.

> After a thorough investigation and evidence gathered because of the report, it was determined that this incident lacked validity and appeared to be fabricated.
>
> When confronted with the evidence gathered by Washington County Detectives Adkins and Roop, Bermeo admitted that she had fabricated the entire story. King University Faculty was immediately notified.
>
> Dyanie Bermeo, age 21, of Mint Hill, North Carolina, was charged by Detective Adkins with Virginia Code [§] 18.2-461 Giving False Report to a Law Enforcement Officer, which is a Class 1 misdemeanor.

ECF No. 61-1. "Andis initiated the [p]ress [r]elease, and Blevins and Adkins were primarily responsible for drafting its content. Adkins also discussed the [p]ress [r]release with Roop prior to its official release to the public." Second Am. Compl., ECF No. 61, ¶ 95. The WCSO had not issued a press release on any arrest in two years.[4] Id. at 104. Bermeo described the effect of this press release in the Complaint:

> In response to the [p]ress [r]elease, Bermeo received hundreds of cruel and hurtful messages on social media, many telling her to kill herself, that she belongs in jail, and that no one would ever sexually assault someone who looks like [Bermeo]. One person wrote: "Based on her picture alone, she only wishes that someone would sexually assault her. No one in their right mind would even consider it."

---

[4] Bermeo makes reference to a similar event where the WCSO did not publish a press release. Bermeo alleges that on June 10, 2021, a 26-year-old woman to whom Bermeo refers as "Jane Doe" reported to the WCSO that "an unmarked vehicle pulled her over, and a man, who appeared to be approximately 6'1" and in his mid-30s, handcuffed her and inappropriately patted her down before letting her go." Second Am. Compl., ECF No. 61, ¶ 111. Two WCSO officers visited Doe at her mother's home, where Doe "allegedly 'confessed' to lying about the traffic stop." Id. ¶ 114. Doe was charged with knowingly filing a false police report with the intent to mislead law enforcement and convicted in Washington County General District Court. Id. ¶¶ 116–117. Bermeo alleges that the WCSO never published a press release detailing the circumstances of Doe's arrest. Id. ¶ 118.

Id. ¶ 105. Media in Virginia and Charlotte, North Carolina "picked up and reported on" the press release. Id. ¶ 106.

Bermeo was tried and found guilty in Washington County General District Court on March 22, 2021, for filing a false report with the intent to mislead law enforcement in violation of Va. Code Ann. § 18.2-461. Id. ¶ 119. She appealed to Washington County Circuit Court, where she opted for a second bench trial. Id. ¶ 122. The court acquitted Bermeo of the charges. Id.

Bermeo alleges that she has suffered irreparable harm to her mental health and emotional wellbeing, including "extreme depression and anxiety, feelings of worthlessness and hopelessness, and she was diagnosed with post-traumatic stress disorder." Id. at ¶¶ 131–132. Bermeo sought professional counseling "to undergo extensive therapy because her depression and anxiety had been debilitating." Id. Specifically, she "was unable to drive, she could not return to school, she could not work, she could not be home alone, and she could not sleep without having terrifying and panic-inducing nightmares." Id. at ¶ 132. "She was ostracized on campus, her grades suffered, and she was forced to finish most of her coursework remotely off campus." Id. at ¶ 133. She further lost her part-time job at Outback Steakhouse and could not pursue an opportunity to intern at the FBI because of her criminal record. Id. at ¶ 136.

## II.

Bermeo originally filed her complaint in the United States District Court for the Western District of North Carolina on September 27, 2022. See Initial Compl., ECF No. 1. Defendants challenged the court's personal jurisdiction, and the court allowed the parties to

conduct limited discovery on the issue. See Order, ECF No. 24. The court then transferred

this case to the Western District of Virginia. See Order, ECF No. 39.

The Magistrate Judge granted Bermeo leave to file a Second Amended Complaint on

November 28, 2023. Order, ECF No. 60. The Second Amended Complaint asserts the

following eleven counts under 42 U.S.C. §§ 1983 and 1985 as well as under Virginia common

law:

> Count One: Unlawful Seizure in Violation of the Fourth Amendment pursuant to 42
> U.S.C. § 1983;
> Count Two: Malicious Prosecution in Violation of the Fourth Amendment pursuant
> to 42 U.S.C. § 1983;
> Count Three: Violation of Fifth Amendment Right Against Self-Incrimination
> pursuant to 42 U.S.C. § 1983;
> Count Four: Violation of Fourteenth Amendment Right to Privacy pursuant to 42
> U.S.C. § 1983;
> Count Five: Violation of Fourteenth Amendment Right to Equal Protection pursuant
> to 42 U.S.C. § 1983;
> Count Six: Failure to Intervene pursuant to 42 U.S.C. § 1983;
> Count Seven: Failure to Supervise pursuant to 42 U.S.C. § 1983;
> Count Eight: Failure to Train pursuant to 42 U.S.C. § 1983;
> Count Nine: Conspiracy to Interfere with Bermeo's Civil Rights pursuant to 42 U.S.C.
> §§ 1983, 1985;
> Count Ten: Intentional Infliction of Emotional Distress under Virginia law;
> Count Eleven: Fraud under Virginia law.

Second Am. Compl., ECF No. 61, at ¶¶ 138–281. Defendants raise challenges to each count

in their motion to dismiss. ECF No. 63.

### III.

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint.

Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to

dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim

to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation

10

omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." Id. at 679; see also Simmons v. United Mortg. & Loan Invest, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (quotation and emphasis omitted).

A court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017). Nevertheless, a court is not required to accept as true "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986); conclusory allegations devoid of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979); or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted). "'Thus, in reviewing a motion to dismiss an action pursuant to Rule 12(b)(6), a court must determine whether it is plausible that the factual allegations in the complaint are enough to raise a right to relief above the speculative level.'" Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009) (quoting Andrew v. Clark, 561 F.3d 261, 266 (4th Cir. 2009)).

## IV.

Each of Bermeo's eleven claims rests on the premise that defendants engaged in unconstitutional policing practices during their interactions with Bermeo. However, nothing in the Second Amended Complaint, its attachments, or the recording of the October 13, 2020, meeting between Bermeo, Adkins, and Roop show that the WCSO violated Bermeo's constitutional rights, engaged in tortious conduct, or committed fraud.

### A.  Federal Constitutional Claims

Bermeo brings nine federal constitutional claims through §§ 1983 and 1985. The court will address each in turn.

### 1.  Count One: Unlawful Seizure

Bermeo brings Count One against Andis and Adkins, alleging that Adkins knowingly presented materially false information to the magistrate to obtain a warrant for Bermeo's arrest. She further alleges that Andis and Adkins used Bermeo's "involuntary coerced false statement based on fabricated evidence" to obtain the warrant. Id. at ¶ 143. She alleges that Adkins effected the seizure at Andis' instruction, and that Bermeo was arrested without probable cause.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. Bermeo's Fourth Amendment claim "is properly 'founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution.'" Massey v. Ojaniit, 759 F.3d 343, 356 (4th Cir. 2014) (quoting Lambert v. Williams, 223 F.3d 257, 262 (4th Cir. 2000)). To state such a claim against Adkins and Andis, Bermeo must establish that (1) these defendants "seized [Bermeo] pursuant to legal process

that was not supported by probable cause" and (2) "that the criminal proceedings have terminated in [Bermeo's] favor." Id. (quoting Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012)). An officer "has probable cause to justify an arrest when 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, that the suspect has committed . . . an offense." English v. Clarke, 90 F.4th 636, 646 (4th Cir. 2024) (citing Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)). "Probable cause requires more than a 'bare suspicion' but less than the evidence necessary to convict." Id. (quoting United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998)).

Bermeo argues that the allegations in the Second Amended Complaint demonstrate that the officers did not have probable cause to arrest her because they obtained her confession through coercion.  However, the recording of the October 13, 2020, conversation between Adkins, Roop, and Bermeo shows that Bermeo voluntarily told the officers that she had fabricated the traffic stop story. There is no indication that either Adkins or Roop used coercive tactics to obtain this information. To the contrary, the officers repeatedly expressed their concern for Bermeo's wellbeing and offered to connect her with counselors. It is true that the officers initially implied that they had not reviewed the surveillance video when they had already done so, however "misrepresentations are insufficient, in and of themselves, to render a confession involuntary."[5] United States v. Whitfield, 695 F.3d 288, 302 (4th Cir. 2012) (quoting Johnson v. Pollard, 559 F.3d 746, 755 (7th Cir. 2009)). The court finds that Bermeo

---

[5] Despite the fact that the WCSO investigation does not rise to the level of unconstitutional, tortious, or fraudulent conduct, one aspect of the officers' interactions with Bermeo is troubling. The officers repeatedly assured Bermeo during the October 13, 2020, conversation that the WCSO would not pursue the issue further, but shortly thereafter Bermeo was criminally charged and the WCSO published a press release on Facebook. The court understands Bermeo's frustrations with the officers' statements, but it cannot be said that they fall outside the bounds of the law.

voluntarily informed the officers that she had fabricated the traffic stop story, which provided the officers with probable cause to arrest Bermeo for filing a false report with the intent to mislead law enforcement. Accordingly, Bermeo has not alleged facts that plausibly show that the WCSO lacked probable cause.

To be sure, probable cause is a factual question to be "determined by a 'totality-of-the-circumstances' approach." Gilliam v. Sealey, 932 F.3d 216, 234 (4th Cir. 2019) (quoting Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017)). But Bermeo must first allege facts that plausibly show she is entitled to relief to survive this motion to dismiss. Iqbal, 556 U.S. at 678. The court can review and consider the recording of Bermeo's interview with Adkins and Roop at the pleadings stage.[6] See Barbour, 105 F.4th at 585, n.2; Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166–67 (4th Cir. 2016). And "in the event of a conflict between the bare allegations of the complaint and any exhibit attached . . ., the exhibit prevails." Goines, 822 F.3d at 166 (quoting Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991)). Here, Bermeo's Second Amended Complaint states that her confession during the October 13, 2020, conversation with Adkins and Roop was obtained through coercion, see Second Am. Compl., ECF No. 61, ¶¶ 59–77, but the recording of this conversation plainly shows that the parties engaged in a concise, civil discussion that involved no coercion whatsoever. See Goines, 822 F.3d at 167 ("[W]hen the complaint . . . shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper."). Given Bermeo's reliance on the October 13, 2020, conversation

---

[6] Moreover, neither party objected to the court's consideration of the recording when queried by the court on this issue at oral argument.

throughout the Second Amended Complaint, it is proper for the court to consider the recording in connection with the motion to dismiss.[7] See Est. of Green v. City of Annapolis, 696 F. Supp. 3d 130, 149 (D. Md. 2023) (relying on body-worn camera footage in resolving a motion to dismiss and stating that "the court will credit the body-worn camera footage to the extent it conflicts with the Complaint, if at all"). The obvious contradictions between the contents of the recording and those of the Second Amended Complaint require the court to adopt the recording as governing Bermeo's claims. As the recording shows that there was no coercion, Count One is dismissed.

### 2. Count Two: Malicious Prosecution

Counts One and Two overlap significantly. Bermeo brings this malicious prosecution claim pursuant to 42 U.S.C. § 1983 against Andis and Adkins. To state a claim for malicious prosecution, Bermeo must allege that Andis and Adkins "(1) caused (2) a seizure of [Bermeo] pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [Bermeo's] favor." Humbert v. Mayor & City Council of Baltimore City, 866 F.3d 546, 555 (4th Cir. 2017).

As discussed with respect to Count One, Andis and Adkins possessed probable cause to arrest Bermeo for filing a false report with the intent to mislead law enforcement. Bermeo's alleged facts, coupled with the recording of the October 13, 2020, conversation, do not show that Bermeo involuntarily told the officers that she made up the traffic stop.[8] Accordingly, Count Two is dismissed.

---

[7] The court's decision would be the same under Rule 12 or Rule 56—the audio recording shows that no reasonable jury could conclude that Bermeo's statements were coerced.

[8] Defendants ask the court to find that probable cause existed based, in part, on the fact that the Washington County General District Court found Bermeo guilty. See Mem. Supp., ECF No. 64, at 9. However, the

### 3. Count Three: Violation of Right Against Self-Incrimination

Bermeo claims that Adkins and Roop violated her Fifth Amendment right against self-incrimination when they questioned her at King University on October 13, 2020, and later used her statements to charge her with filing a false report with the intent to mislead law enforcement. The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, provides that no one "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. However, the Fifth Amendment protects a criminal defendant's trial rights and does not serve as a cause of action for a civil plaintiff. See United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990) ("Although conduct by law enforcement officials prior to trial may ultimately impair that [Fifth Amendment] right, a constitutional violation occurs only at trial." (citing Kastigar v. United States, 406 U.S. 441, 453 (1972))). Moreover, even if the Fifth Amendment could provide a cause of action in a civil case, Bermeo's statements to Adkins and Roop during the October 13, 2020, conversation were not obtained via coercion or otherwise given involuntarily, so no claim under the Fifth Amendment exists here. Accordingly, Count Three is dismissed.

### 4. Count Four: Due Process—Right to Privacy

Bermeo contends that the press release violated her right to privacy in contravention to the Due Process Clause of the Fourteenth Amendment. "The constitutional right to privacy extends to the individual interest in avoiding disclosure of personal matters." Payne v. Taslimi, 998 F.3d 648, 655 (4th Cir. 2021). However, the press release does not disclose personal

---

Washington County Circuit Court later acquitted Bermeo, so the court makes its probable cause determination based on the audio recording and Bermeo's allegations, not a state court finding that was later overturned.

matters—it describes Bermeo's allegations and the course of the WCSO investigation. <u>See</u> ECF No. 61-1. Though the press release includes Bermeo's photograph, age, and hometown, their disclosure alone does not violate her right to privacy.

Bermeo's federal constitutional right to privacy claim is foreclosed by the Supreme Court's decision in <u>Paul v. Davis</u>, 424 U.S. 693 (1976). In <u>Paul</u>, an arrestee sued the chiefs of two local police departments for including his name and photograph in a pamphlet entitled "Active Shoplifters" that law enforcement distributed to 800 merchants around Louisville, Kentucky. <u>Id.</u> at 694–95. The arrestee had been charged the previous year with shoplifting and the charge remained pending at the time the pamphlets were circulated. <u>Id.</u> The arrestee claimed, in relevant part, that publication of his name and photograph violated his right to privacy under the Fourteenth Amendment. <u>Id.</u> at 712–13. The Court found that no constitutional violation occurred because the disclosure of his arrest on the shoplifting charge did not amount to a right considered "'fundamental' or 'implicit in the concept of ordered liberty.'" <u>Id.</u> at 713 (quoting <u>Palko v. Connecticut</u>, 302 U.S. 319, 325 (1937), <u>overruled on other grounds by</u> <u>Benton v. Maryland</u>, 395 U.S. 784, 794 (1969)). It follows from <u>Paul</u> that the WCSO's publication of the outcome of the investigation, including Bermeo's arrest, as well as her photograph, hometown, and age does not give rise to a privacy claim under the Due Process Clause of the Fourteenth Amendment. <u>See also</u> <u>Houston v. Cnty. of Maricopa</u>, 661 F. Supp. 3d 947, 953–54 (D. Ariz. 2023) (acknowledging that no federal constitutional violation occurred where an arrestee's mugshot, name, birthdate, and "crime type" were published on the Maricopa County Sheriff's Office website). As such, Count Four is dismissed.

### 5. Count Five: Equal Protection

Bermeo claims that Andis, Adkins, Blevins, and Roop violated the Equal Protection Clause of the Fourteenth Amendment by publishing the press release. She contends that they did so selectively, because Bermeo is Hispanic, not having published a press release during the two preceding years. She further argues that the WCSO did not publish a press release for a similar case against Jane Doe, a white woman. Notably, she does not claim that her arrest or criminal charge violated the Equal Protection Clause.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV. "The Equal Protection Clause limits <u>all</u> state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." <u>Sylvia Dev. Corp. v. Calvert Cnty.</u>, 48 F.3d 810, 818 (4th Cir. 1995) (emphasis in original). To succeed on an equal protection claim, a plaintiff must "show that: (1) the defendants deprived [the plaintiff] of a constitutional right; and (2) the defendants did so 'under the color of [State] statute, ordinance, regulation, custom, or usage." <u>Peltier v. Charter Day Sch., Inc.</u>, 37 F.4th 104, 115 (4th Cir. 2022). Bermeo's equal protection claim fails at the first step—she has not identified a constitutional right of which she was deprived. Instead, Bermeo alleges that "[b]y choosing to selectively disclose personal, private information about [Bermeo], and not Jane Doe, and by intentionally making an effort to intimidate, shame, and humiliate [Bermeo], and not Jane Doe, [d]efendants knowingly and intentionally chose to treat [Bermeo] differently from Jane Doe, who was similarly situated and prima facie identical to [Bermeo] in all relevant respects." Second Am. Compl., ECF No. 61, ¶ 201. However, Bermeo has not shown that the publication of a press release about a police investigation that resulted in criminal charges

violates her constitutional rights. Moreover, she has not shown that the investigation itself, including the October 13, 2020, conversation with law enforcement, violated her constitutional rights. Accordingly, Count Five is dismissed.

### 6. Counts Six, Seven, Eight, and Nine: Failure to Intervene, Failure to Supervise, Failure to Train, and Conspiracy to Violate Constitutional Rights

Each of Counts Six through Nine of Bermeo's Second Amended Complaint assumes that an underlying constitutional violation occurred. In Count Six, Bermeo claims that all four defendants failed to intervene to prevent violations of Bermeo's constitutional rights. See id. ¶¶ 208–212. In Count Seven, Bermeo claims that Andis failed to supervise Blevins, Adkins, and Roop, which resulted in violations of Bermeo's constitutional rights. See id. ¶¶ 213–228. In Count Eight, Bermeo claims that Andis failed to train Blevins, Adkins, and Roop, which caused violations of Bermeo's constitutional rights. See id. ¶¶ 229–241. In Count Nine, Bermeo claims that all four defendants conspired to violate Bermeo's constitutional rights. See id. ¶¶ 242–254.

Each of these claims fails because the facts as alleged do not plausibly show that defendants violated Bermeo's constitutional rights. As discussed above, Bermeo's claims under the Fourth Amendment, Fifth Amendment, and Fourteenth Amendment are without merit. Additionally, Bermeo has not alleged sufficient facts to show that defendants conspired to violate her constitutional rights. Accordingly, Counts Six, Seven, Eight, and Nine are dismissed.

### B. Virginia Law Claims (Counts Ten and Eleven)

Bermeo asserts two claims under Virginia law: intentional infliction of emotional distress (Count Ten) and fraud (Count Eleven).

### 1. Count Ten: Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress under Virginia law, a plaintiff must show that:

> One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

Womack v. Eldridge, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974). "[S]ubstantive claims for intentional infliction of emotional distress under Virginia law 'need not be pled [in federal court] with the degree of specificity required by Virginia courts.'" Faulkner v. Dillon, 92 F. Supp. 3d 493, 500 (2015) (quoting Nelson v. Green, No. 3:06-cv-070, 2014 WL 131055, at *14 (W.D. Va. Jan. 14, 2014)).

Here, Bermeo does not allege conduct that qualifies as "outrageous and intolerable in that it offends against the generally accepted standards of decency and morality." Womack, 215 Va. at 342, 210 S.E.2d at 148. She takes issue with Adkins and Roop's conduct during the October 13, 2020, conversation at King University and with the press release, but neither event reaches the requisite level of depravity. The recording of the conversation shows that the officers expressed their concern for Bermeo's wellbeing, and the press release recounts the events of a WCSO investigation that resulted in criminal charges. These facts are not sufficient to establish a claim for intentional infliction of emotional distress.

## 2. Count Eleven: Fraud

Bermeo claims that Adkins and Roop committed fraud during their October 13, 2020, conversation with Bermeo. See Second Am. Compl., ECF No. 61, ¶¶ 271–281. Specifically, she points to two representations: first, their statement that the surveillance video showed her car driving without anyone behind her, see Second Am. Compl., ECF No. 61, ¶¶ 272–273, and second, their representation that "they would maintain her privacy." See id. ¶ 274.

To plead a claim for actual fraud under Virginia law, a plaintiff must allege facts that plausibly show "(1) a false misrepresentation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." State Farm Mut. Auto. Ins. Co. v. Remley, 270 Va. 209, 218, 618 S.E.2d 316, 321 (2005) (quoting Prospect Dev. Co. v. Bershader, 258 Va. 75, 85, 515 S.E.2d 291, 297 (1999)). Under Federal Rule of Civil Procedure 9, a party asserting fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

Bermeo has not pled facts that plausibly show she relied on these representations. Bermeo voluntarily and without coercion admitted that she fabricated the traffic stop story and therefore knew that the surveillance video would not reveal a car trailing her. See Beck v. Smith, 260 Va. 452, 457, 538 S.E.2d 312, 315 (2000) (explaining that a plaintiff cannot rely on a false representation when the plaintiff already has personal knowledge of the issue at hand). Bermeo also does not state a claim for fraud with respect to Adkins and Roop's representation that "they would maintain her privacy" because an unfulfilled promise about future events does not give rise to a fraud claim. See Hazaimeh v. U.S. Bank Nat. Ass'n, 94 F. Supp. 3d 741, 748 (E.D. Va. 2015) ("[A] promise to perform an act in the future is not, in a legal sense, a

representation as that term is used in the fraud context." (quoting <u>Lissmann v. Hartford Fire</u> <u>Ins. Co.</u>, 848 F.2d 50, 53 (4th Cir. 1988)). Accordingly, Bermeo's claim for fraud is dismissed.

**V.**

In conclusion, defendants' motion to dismiss is **GRANTED** and the Second Amended Complaint is **DISMISSED**.

An appropriate order will be entered.

Entered: August 16, 2024

Mike Urbanski
Senior U.S. District
Judge
2024.08.16 12:46:10
-04'00'

Michael F. Urbanski
Senior United States District Judge