CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED
September 30, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **DYANIE BERMEO,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **Case No. 1:23-cv-00041** |
| **v.** | ) | |
| | ) | |
| **BLAKE ANDIS, et al.,** | ) | **By: Hon. Michael F. Urbanski** |
| | ) | **Senior United States District Judge** |
| **Defendants** | ) | |

# MEMORANDUM OPINION

Following remand from the Fourth Circuit Court of Appeals, this case is before the court on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by defendants Sheriff Blake Andis, Captain Jamie Blevins, Detective Scott Adkins, and Detective Brad Roop. ECF No. 63. Plaintiff Dyanie Bermeo raises claims under 42 U.S.C. § 1983 against the defendants, all of whom worked for the Washington County Sheriff's Office ("WCSO") at the time the events are alleged to have occurred. She sues all the defendants in their individual capacities. Second Am. Compl., ECF No. 61 ¶¶ 10-13. Bermeo alleges that the defendants subjected her to the following unconstitutional actions: unlawful seizure in violation of the Fourth Amendment (Count One), malicious prosecution in violation of the Fourth Amendment (Count Two), violation of her Fourteenth Amendment right to privacy (Count Four), failure to intervene (Count Six), failure to supervise (Count Seven), failure to train (Count Eight), and intentional infliction of emotional distress in violation of Virginia law (Count Ten).

Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), the parties have stipulated to dismissal without prejudice of a Fifth Amendment claim against Adkins and Roop (Count Three), an equal protection claim against all defendants (Count Five), a claim of conspiracy to interfere with plaintiff's civil rights against all defendants (Count Nine), and a Virginia state law fraud claim against Adkins and Roop (Count Eleven). Stip. Of Vol. Dismissal, ECF No. 98. Accordingly, **Counts Three, Five, Nine, and Eleven are DISMISSED without prejudice.**

The pending motion to dismiss the remaining claims has been fully briefed and the court heard oral argument on the motion on March 14, 2024. ECF No. 70. The court granted the motion to dismiss on August 16, 2024, considering in its opinion a recording of an interview of Bermeo by defendant law enforcement officials that the court found blatantly contradicted the factual allegations of the complaint. Mem. Op. and Order, ECF Nos. 82, 83. Bermeo filed a motion to vacate the dismissal order, which the court denied. Bermeo appealed, and the Fourth Circuit vacated the order granting the motion to dismiss, holding that the district court erred in determining that a recording of a supposed confession blatantly contradicted the factual allegations in Bermeo's complaint. Bermeo v. Andis, 163 F.4th 87, 89 (4th Cir. 2025) (citing Doriety for Est. of Crenshaw v. Sletten, 109 F.4th 670 (4th Cir. 2024)); ECF No. 96 herein. The Fourth Circuit remanded the case "so the court can decide whether the complaint, on its face, survives defendants' motion to dismiss." Id.

On remand, the parties resubmit defendants' motion to dismiss for a ruling on the briefs. Joint Notice, ECF No. 99. In considering this motion, the court considers both the briefing on the motion to dismiss, ECF Nos. 64, 68, 69, and the briefing on plaintiff's motion

to vacate, ECF Nos. 85, 86, 87. For the reasons set forth below, the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

**I. Background**

**A. Factual Allegations**

The following summary of facts is pulled exclusively from the second amended complaint and construed in the light most favorable to Bermeo.

**1. The Assault**

Plaintiff Dyanie Bermeo alleges that she was sexually assaulted during an illegal traffic stop in Abingdon, Virginia on September 29, 2020. Id. ¶ 1. At the time, she was 21 years old and a third-year student at King University in Bristol, Tennessee, where she was studying criminal justice and psychology. Id. ¶ 2. She alleges that around 9:30 p.m., she was driving through Abingdon on her way back to King University when she was pulled over on Old Jonesboro Road by an unmarked vehicle with blue flashing lights. Id. ¶ 17. The driver of the unmarked vehicle (the "Assailant") approached her vehicle, shined a flashlight in her face, asked her how fast she was driving, and ordered her to exit her vehicle, "threaten[ing] to call additional officers for backup if she failed to comply." Id. ¶ 19. Complying with the order, Bermeo exited the car. The Assailant spun Bermeo around and pinned her hands against the driver's side window of her car. He proceeded to pat her down, touch her breasts, and fondle her vagina. Id. ¶ 20. After a few minutes, the Assailant returned to his vehicle, sped past Bermeo, and turned right at the nearest intersection onto Spring Creek Road, which was approximately 500 feet from where Bermeo was parked. Id. After the encounter, Bermeo returned to her car and drove to school. Id. ¶¶ 21-22.

**2. The Investigation**

Bermeo confided in her friend, Shelby, about the assault, who encouraged her to go to the police. A professor who Bermeo told about the incident also encouraged her to go to the police. Id. ¶¶ 22-23. On September 30, 2020, Shelby helped Bermeo call the WCSO in Abingdon to report the crime. Id. ¶¶ 24-25. Defendant Detective Adkins then called Bermeo and asked her to come to the WCSO for an interview at 6:00 p.m. that day. Id. ¶ 26.

The interview, held in a private office at the WSCO station, lasted about 50 minutes and involved Bermeo, Shelby, defendant Detective Adkins, defendant Captain of Criminal Investigations Blevins, and Major Scott Snapp.[1] Id. ¶¶ 11-12, 27. Bermeo alleges that the interview was recorded by defendant Blevins using his iPhone, and Shelby was permitted to be in the room. Id. ¶ 27. Bermeo was not asked about whether she felt comfortable interviewing in a closed private office with three men, without a victim advocate. Id. ¶ 28. The officers asked questions to determine whether the Assailant was a law enforcement officer or an individual impersonating law enforcement, such where the stop occurred and descriptions of the Assailant, but they did not ask about specifics of the assault, such as whether physical contact was made or the nature of the contact. Nor did they take Bermeo's clothing for evidence, examine her car for evidence, or advise her that she could go to the hospital for a sexual assault exam. Id. ¶¶ 29-30. Bermeo alleges that after she was escorted out of the building, "Blevins and Snapp were recorded discussing a named potential suspect who fit the

[1] Snapp originally was a defendant in this case. Bermeo voluntarily dismissed all claims against Snapp on April 4, 2023. ECF No. 25.

Assailant's physical description and had a history of impersonating law enforcement." Id. ¶¶ 32-35.[2]

In the following two weeks, Adkins conducted a "brief investigation." Id. ¶ 36. Bermeo alleges many deficiencies in the investigation and the resulting investigative report, including the following: Adkins reviewed video surveillance from one nearby gas station and did not see a match of the Assailant's car, but there are several other routes the Assailant may have taken that would not be within range of that camera; Adkins did not obtain or review footage from either of two other nearby gas stations; Adkins spoke to a technician at a nearby car dealership who had reviewed their security video footage and saw Bermeo's car and no car following it, which Bermeo claims corroborates her report, but Adkins did not review the footage himself; Adkins obtained blurry video footage from a private residence on Old Jonesboro Road from a different date and time from the alleged assault; Adkins sat outside the potential suspect's home and did not see a vehicle matching the description, and after two visits ruled out the individual as a person of interest but included no mention of that potential suspect or person of interest in his official investigative report; the official report indicates that Adkins was assisted in the investigation by the Town of Abingdon and the Virginia State Police, but that "assistance" was limited to those agencies receiving a "Be on the Lookout" notice about the Assailant's vehicle; Adkins did not go to the crime scene to look for evidence (DNA, spitting tobacco, tire tracks); Adkins did not interview the residents of the houses where the incident

[2] Bermeo described the Assailant as being 6 feet, 4 inches tall with a stocky build, in his 30s or 40s, with a thick southern accent, chewing tobacco, who was wearing gloves, long black pants tucked into law-enforcement style boots, a long-sleeved black dress shirt, a black Kevlar vest and a silver badge. He was driving an older model gray sedan with rectangular taillights, no license plate, and flashing blue lights across the windshield. Second Am. Compl., ECF No. 61 ¶ 32.

occurred or where Bermeo thought the car was sitting; and Adkins did not interview the potential suspect. Id. ¶¶ 36-47.

After this investigation, defendant detectives Adkins and Roop asked Bermeo to return to the WCSO for questioning. Id. ¶ 48. Bermeo met with the detectives at the WCSO on October 13, 2020, where the detectives asked her more questions about the Assailant's vehicle, badge, and clothing. Id. ¶ 49. At the detectives' request, Bermeo left her phone, keys, and wallet at the station while the group went to the scene of the incident to see if it would help her to recall any additional details. Id. ¶ 50. At the scene, the detectives falsely represented that they were still getting video from the owner of one of the homes, and that they would be able to identify the Assailant's car from the video. Id. ¶ 51. The detectives allegedly believed that Bermeo's body language was "suspicious," and concluded that Bermeo was lying about the stop and the sexual assault based on that "suspicious" behavior and their lack of evidence. Id. ¶ 52.

**3. The Interrogation**

After Bermeo and the detectives left the scene of the incident, Bermeo collected her belongings from the WCSO and returned to King University. Id. ¶ 54. Shortly thereafter, she received a series of threatening text messages from an unknown number. The messages said: "They won't find anything"; "U should have never gone to the police," "Just know that I know where U live … where U work … everything … I would reconsider"; "Tell the police u changed ur mind and I will leave u alone …if not I won't go for you…just know that." Id. ¶ 55. Bermeo told her father about the text messages and when her father called the unknown

number, it rang Bermeo's device. Her father told her to contact the detectives handling her case and she did so. Id. ¶ 57.

When Bermeo contacted Adkins about the messages, he and Roop drove to King University in Bristol, Tennessee to look at her phone, arriving approximately one hour later. Id. ¶ 58. Bermeo alleges that Roop and Adkins crossed state lines with a preconceived plan to use fabricated evidence and veiled threats to coerce her into an involuntary false confession, which they planned to secretly record. Id. ¶ 59.

In a 24-minute-long interrogation on King University campus, which was "secretly recorded," the detectives told Bermeo that there are downloadable apps that could be installed to send these kinds of text messages, and that they could "dump" her phone to find the originating device. Id. ¶¶ 59-61. They also told her that they had already obtained video from a nearby house and saw Bermeo's car drive by with no one following. Id. ¶¶ 64-65. Bermeo alleges that this was an intentional deception, because the video they were describing was from the wrong date and time, and, in any case, "it was impossible to discern any of the vehicles in the video," including Bermeo's. Id. ¶¶ 65-67. The detectives "used veiled threats," that Bermeo was "digging her hole even deeper" and that "she needed to keep 'quiet' because they did not want to 'embarrass' her." Id. ¶¶ 68-74. Bermeo, "afraid that Roop and Adkins were pressuring her to involuntarily recant her report because they had identified the Assailant as a legitimate law enforcement officer," agreed via "an audible noise" to their statement that she had not actually been assaulted. When Roop asked her why she would make up such an allegation, she replied that she did not know. When asked how she sent the text messages to herself, she

repeated the detectives' assertion that "there's an app. It will just trace back to my phone." Id. ¶¶ 70-71, 73–74.

Bermeo alleges that she did not feel free to leave the encounter, and that she interpreted the officers' line of questioning—paired with the threatening text messages, the fact that the detectives crossed state lines to go to her school right after she was warned that the Assailant knew where she lives, and that her phone had been in police custody on the morning of the day the messages were sent—as a potential threat. Id. ¶¶ 75-76, 147. She was afraid that the detectives "were pressuring her to involuntarily recant her report because they had identified the Assailant as a legitimate law enforcement officer." Id. ¶ 74.

Even though the detectives assured Bermeo that they would not talk to anyone else about the incident, Roop and Adkins spoke to the Director of Safety and Security at King University about Bermeo's alleged "confession." Id. ¶¶ 77-78. Bermeo contends that they did this to keep her quiet, because reporting the "confession" served no legitimate law enforcement purpose as the incident occurred off campus, in a different state. Id. ¶ 79. Bermeo was then subject to an official disciplinary proceeding at the university and faced expulsion. Id. ¶ 80. She alleges that she would have been expelled but for the intervention of her counsel. Id. ¶ 134.

**4. Bermeo's Arrest and the Press Release**

On October 14, 2020, the day after the interview, Bermeo alleges that defendant Sheriff Andis ordered Adkins to use the confession as probable cause to arrest Bermeo for knowingly filing a false police report with the intent to mislead law enforcement in violation of Virginia Code § 18.2-461. Id. ¶ 81. Because that "confession" was "given under coercion and false

pretenses," and because defendants knew that it was given under those circumstances, she alleges that the officers knowingly made false statements and omissions to the magistrate to obtain a warrant without probable cause. Id. ¶¶ 81-84. Bermeo alleges that defendant Blevins, directly supervising Adkins and Roop, was aware that the other defendants were acting in violation of Bermeo's Fourth and Fifth Amendment Rights, but took no action. Id. ¶¶ 85-87.

The next day, October 15, 2020, Adkins called Bermeo and asked her to come to the WCSO to "close out the case." Id. ¶ 89. When she arrived, she was arrested for knowingly filing a false police report with the intent to mislead law enforcement. Id. ¶ 90-94.

While Bermeo was being booked, Adkins used his cell phone to take a "separate personal photo" of her. Bermeo alleges that defendants Andis, Blevins, and Adkins collaborated on a press release to publicize Bermeo's confession. Id. ¶¶ 94-95. The press release identified Bermeo by name and university, included the photo from Adkins's cell phone, and gave the location of her home neighborhood.

The press release was publicized on October 16, 2020, on WCSO's Facebook page—the first press release that the WCSO had issued in two years. Id. ¶¶ 103-104. The release garnered significant attention from local news sources in North Carolina and Virginia, and from the public at large. Id. ¶¶ 105-106. Because of the post, Bermeo received "hundreds of cruel and hurtful messages on social media, many telling her to kill herself, that she belong[ed] in jail, or that no one would ever sexually assault someone who look[ed] like [her]." Id. ¶ 105.

Bermeo alleges that the disclosure of her identity and personal information violated her constitutional right to privacy, as well as Va. Code § 63.2-104.1, the WCSO's media relations policy, and the 2020 grant agreement between the WCSO and the Virginia Department of

Criminal Justice Services. Id. ¶¶ 96-97, 100. In deposition testimony related to jurisdictional issues raised early in the lawsuit, Adkins and Roop claimed to be unaware of the WCSO's Media Relations Policy, while Blevins said he was "vaguely" familiar with it and "feigned confusion as to its application." Id. ¶¶ 99-100. According to the WCSO's media relations policy, Andis had discretion of and responsibility for press releases. Id. ¶ 101.

While the defendants claimed as part of the jurisdictional discovery that the purpose of the press release was to calm concern in the local community about a potential sexual predator, Bermeo's complaint was not widely known before the press release was issued. Id. ¶ 107. Bermeo further alleges that the statement could have been made without disclosing her "identity and personal, private information." Id. ¶ 108.

**6. Criminal Prosecution**

At a bench trial in Washington County District Court, based on the "coerced, involuntary, false 'confession,'" Bermeo was convicted of violating Virginia Code § 18.2-461, the crime of falsely reporting a crime with the intent to mislead law enforcement. Id. ¶ 119-120. Bermeo appealed and was granted a de novo trial. Id. ¶ 121. In that second trial, Bermeo was acquitted. Id. ¶ 122.

At the second trial, Bermeo's counsel questioned defendants about the WCSO "VSTOP Detective" who was "allegedly tasked" with thoroughly investigating all WCSO sexual assault and domestic violence reports, but who was not consulted or involved in Bermeo's case "at any point in time." Id. ¶ 123-124.[3] The VSTOP detective is funded through

[3] The Virginia Department of Criminal Justice Services describes the VSTOP program as follows: In 1994, the United States Congress passed the Violence Against Women Act (VAWA) as part of the Violent Crime Control and Law Enforcement Act. One part of VAWA is the STOP (Services, Training, Officers, Prosecution)

VAWA grants, and Andis, as Sheriff, had stated in the application for funding that he would conduct two trainings per year on VAWA issues, including sexual assault. Id. ¶ 125. Defendants Blevins, Adkins, and Roop all testified that they were unfamiliar with the WCSO's Sexual Assault Response Policy, had not been trained on the policy at the time that they were investigating Bermeo's complaint, and had not received training on investigating sexual assaults or communicating with sexual assault victims. Id. ¶ 126.

**7. Jane Doe Allegations**

Less than a year after Bermeo's report, a 26-year-old woman from Bristol, Virginia, identified herein as Jane Doe, reported a similar assault to the WCSO on June 21, 2021. Id. ¶ 111. She asserted that "an unmarked car pulled her over, and a man, who appeared to be approximately 6'1" and in his mid-30s, handcuffed her and inappropriately patted her down before letting her go." Id. On June 21, 2021, after a brief investigation which purportedly consisted of obtaining and reviewing video surveillance footage, the WCSO contacted Doe and asked her to go to the WCSO. Jane Doe expressed unease about going to the station and called the WCSO to say that she would not be keeping her appointment. Id. ¶ 112-113. Two WCSO officers immediately tracked her down at her mother's house, where Doe "allegedly

---

Violence Against Women program, administered by the U.S. Department of Justice Office on Violence Against Women (OVW). The STOP program promotes a coordinated, multidisciplinary approach to improving the criminal justice system's response to violent crimes against women; encourages the development and strengthening of effective law enforcement and prosecution strategies to address violent crimes against women; and the development and strengthening of victim services in cases involving violent crimes against women. The Virginia Department of Criminal Justice Services (DCJS) implements the Violence Against Women Act STOP grant program for Virginia. The STOP program, known as VSTOP in Virginia, is guided by the VSTOP State Planning Team. https://www.dcjs.virginia.gov/grants/programs/cy-26-virginia-services-training-officers-prosecution-vstop-grant-program (last viewed Sept. 18, 2026).

'confessed' to lying about the traffic stop." Id. ¶¶ 113, 114. Those two officers were supervised by Blevins and Andis. Id. ¶ 115.

On June 28, 2021, one of the officers arrested Jane Doe "without probable cause" for a violation of Virginia Code § 18.2-461, the same statute under which Bermeo was arrested and prosecuted. Id. ¶ 117. Doe was prosecuted and sentenced to 30 days in jail, suspended 12 months on the condition of good behavior. There was no press release issued for Jane Doe's arrest. Id. ¶ 118.

**8. Harm**

As a result of defendants' actions, Bermeo alleges that she suffered irreparable harm to her mental health and emotional well-being, including that she has been diagnosed with post-traumatic stress disorder and has struggled with suicidal ideation. Id. ¶¶ 129-132. She was forced to finish her degree online, lost her job at Outback Steakhouse, and lost the opportunity to intern at the FBI because of her criminal record. Id. ¶ 133-136.

**B. Procedural History**

Bermeo filed her complaint in the United States District Court for the Western District of North Carolina on September 27, 2022. See Bermeo v. Andis, No. 3:22cv505 (W.D.N.C. filed Sept. 27, 2022). On October 25, 2023, the court sua sponte transferred the case to the Western District of Virginia, after finding venue was proper here because the events complained of occurred in this district. Order, ECF No. 39.

After the case was transferred, Bermeo filed her second amended complaint, ECF No. 61, which is the operative pleading in this case. Defendants filed a motion to dismiss for failure to state a claim, the parties briefed the issues, and the court held a hearing. On August 16,

2024, the court granted the defendants' motion and dismissed the case. The court found that "the recording of the October 13, 2020, conversation between Adkins, Roop, and Bermeo shows that Bermeo voluntarily told the officers that she had fabricated the traffic stop story." Mem. Op. ECF No. 82 at 13.

As set forth above, Bermeo appealed and the Fourth Circuit remanded the case to this court, finding that the court's reliance on the October 13, 2020, recording was inappropriate because the recording did not "blatantly contradict" Bermeo's allegation that she "did not think that she had any choice but to tell Roop and Adkins what they wanted to hear." Bermeo, 163 F.4th at 94 (citing Doriety for Estate of Crenshaw v. Sletten, 109 F.4th 670 (4th Cir. 2024)). The Fourth Circuit stated that although this court found that the recording was inconsistent with Bermeo's claim that she was coerced into confessing, "coercion is a legal characterization of factual allegations, not a factual allegation itself. So, the recording cannot be used to contradict it." Id. The Fourth Circuit further found the following:

> The district court did identify one factual allegation it found to be blatantly contradicted by the recording. It found the recording contradicted Bermeo's allegation that she "did not think that she had any choice but to tell Roop and Adkins what they wanted to hear." J.A. 148 (cleaned up). While that's certainly a factual allegation, the recording didn't blatantly contradict it. Perhaps the recording calls Bermeo's allegation into question. And true, "testimony by an accused about his prior subjective mental impressions and reactions must be carefully scrutinized" since it may be motivated by self-interest. United States v. Braxton, 112 F.3d 777, 781 (4th Cir. 1997). Even so, we don't make credibility determinations at the motion-to-dismiss stage. . . . And in effect, the district court's assessment of this allegation is that it is not credible based on the recording. Doriety doesn't permit that. Cf. Alexander v. Connor, 105 F.4th 174, 179 (4th Cir. 2024) (noting in the context of summary judgment that "[a] court may not disregard contrary evidence just because there is a video that lines up with a governmental officer's version of events or

> even makes it unlikely that the plaintiff's account is true" (internal quotation marks and citation omitted)).

Id. The court further noted that its holding did not mean that the recording was irrelevant, but at the Rule 12(b)(6) stage, it was error to determine that the recording blatantly contradicted the factual allegations in Bermeo's complaint. The Fourth Circuit remanded the case "so the court can decide whether the complaint, on its face, survives the defendants' motion to dismiss." Id. at 2.

**II. Discussion**

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In evaluating a motion to dismiss under Rule 12(b)(6), a court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017).

And, as the Fourth Circuit put it in this case:

> At this stage, the district court is "limited to considering the sufficiency of the allegations set forth in the complaint and the documents attached or incorporated into the complaint" and may not "resolve contests surrounding the facts" or "the merits of a claim." Halscott Megaro, P.A. v. McCollum, 66 F.4th 151, 157

> (4th Cir. 2023)(internal quotation marks and citations omitted). If the district court wants to look beyond the complaint and any attachments to it, the motion to dismiss "must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Bermeo, 163 F.4th at 93.

### A. Count One: Unlawful Seizure in Violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983

Bermeo alleges that Sheriff Andis and Detective Adkins unlawfully seized her in violation of her rights under the Fourth Amendment. Second Am. Compl., ECF No. 61 ¶¶ 138-154. The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. "'[S]eizure of an individual effected without probable cause is unreasonable.'" Miller v. Prince George's Cnty., MD, 475 F.3d 621, 627 (4th Cir. 2007) (quoting Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996)).

Bermeo alleges that Adkins made false representations and omissions of material fact in order to obtain a warrant to arrest her without probable cause. "False statements or omissions violate the Fourth Amendment only if they are both 'material, that is, necessary to the finding of probable cause,' and 'made deliberately or with a reckless disregard for the truth.'" Norton v. Tabron, 727 F. App'x 762, 764-65 (4th Cir. 2018) (quoting Massey v. Ojaniit, 759 F.3d 343, 357 (4th Cir. 2014)). See also Quarles v. Weeks, 815 F. App'x 735, 738 (4th Cir. 2020) ("False statements or omissions [when applying for an arrest warrant] violate the Fourth Amendment only if they are both 'material, that is, necessary to the finding of probable cause,' and 'made deliberately or with a reckless disregard for the truth.'") (citing Massey, 759 F.3d at 357 (4th Cir. 2014)).

**1. Materiality**

A false statement is material when it is "necessary to the neutral and disinterested magistrate's finding of probable cause." Humbert v. Mayor & City Council of Baltimore City, 866 F.3d 546, 556 (4th Cir. 2017), as amended (Aug. 22, 2017) (quoting Miller, 475 F.3d at 628) (citation modified). "We determine materiality by 'excis[ing] the offending inaccuracies' and then assessing whether the 'corrected' evidence, excluding the misstatements, 'would establish probable cause.'" Massey, 759 F. 3d at 357 (quoting Miller, 475 F.3d at 628); see also Franks v. Delaware, 438 U.S. 154, 156 (1978) (holding, in the context of a challenge to a search warrant, that if an "allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.").

Bermeo asserts that Andis presented false representations and omissions to Magistrate Eddie Stiltner to obtain a warrant to arrest her. Second Am. Compl., ECF No. 61 ¶¶ 5, 82. She further claims that Adkins acted "pursuant to Andis' direct orders." Id. ¶ 82, 140-141. Chief among the false representations is the allegedly involuntary confession, which Bermeo alleges Andis knew she made under coercion and false pretenses. Id. ¶ 81. In addition, Bermeo alleges that defendants presented intentionally falsified information and omitted material facts from their investigative report to the magistrate. Clearly, a representation by Adkins to the magistrate that Bermeo confessed to filing a false police report would have been material to the issuance of an arrest warrant for Bermeo. If the allegedly coerced confession were excised

from the representations made to the magistrate, the evidence would have shown only that the investigation did not turn up the identity of the Assailant, and not that Bermeo invented the allegations.

**2. Made Deliberately or with Reckless Disregard for the Truth**

In addition, the material representation must have been "made deliberately or with reckless disregard for the truth."' Norton, 727 F. App'x at 765. "Reckless disregard 'can be established by evidence that a police officer failed to inform the judicial officer of facts he knew would negate probable cause."' L.M. by Roe #1 v. Graham, 168 F.4th 196, 201 (4th Cir. 2026) (quoting Miller, 475 F.3d at 627).

Bermeo alleges that the representation to the magistrate that she confessed to making a false police report was a deliberate falsehood by Adkins, made at the direction of Andis. "A coerced or fabricated confession that police know to be coerced . . . does not give police probable cause to arrest the suspect as a matter of law." Gilliam v. Sealey, 932 F.3d 216, 234 (4th Cir. 2019). See also Ashcraft v. Tennessee, 322 U.S. 143, 155 (1944) ("The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession."). When inquiring whether there was probable cause, the court "consider[s] only the information the officers had at the time of the arrest. Additionally, we do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause." Gilliam, 932 F.3d at 234 (citation modified).

> The test for determining whether a statement is voluntary under the Due Process Clause is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any

> improper influence. In Colorado v. Connelly [479 U.S. 157, 167 (1986)], the Supreme Court held that coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause. The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired.

United States v. Tangtong, No. 7:18-CR-0002, 2018 WL 6183291, at *9 (W.D. Va. Nov. 27, 2018) (internal citations omitted). See also United States v. Dodier, 630 F.2d 232, 235–36 (4th Cir. 1980) (evaluating the voluntariness of a confession based on whether it is the "product of an essentially free and unconstrained choice by its maker"); Ferguson v. Boyd, 566 F.2d 873, 877 (4th Cir. 1977) ("The ultimate question is whether the pressure, in whatever form, was sufficient to cause the petitioner's will to be overborne and his capacity for self-determination to be critically impaired.").

Importantly, "[c]oercion is determined from the perspective of the suspect." Illinois v. Perkins, 496 U.S. 292, 296 (1990) (citing Rhode Island v. Innis, 446 U.S. 291, 301 (1980); Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). "[W]hether a confession is involuntary 'is a question of fact to be determined from 'the totality of the surrounding circumstances[,] both the characteristics of the accused and the details of the interrogation." Gilliam, 932 F.3d at 236 (quoting United States v. Wertz, 625 F.2d 1128, 1134 (4th Cir. 1980)). See also Ferguson, 566 F.2d at 877 ("Inasmuch as the degree of pressure necessary to crush one's will varies with the individual and the circumstances of the arrest and detention, a finding of coercion and involuntariness must be based upon a careful consideration of the totality of the

circumstances.") (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). The totality of the circumstances review can encompass many of the vulnerabilities of the accused:

> Some of the factors taken into account have included the youth of the accused, e.g., Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; his lack of education, e.g., Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; or his low intelligence, e.g., Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; the lack of any advice to the accused of his constitutional rights, e.g., Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; the length of detention, e.g., Chambers v. Florida, supra; the repeated and prolonged nature of the questioning, e.g., Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; and the use of physical punishment such as the deprivation of food or sleep, e.g., Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. Culombe v. Connecticut, supra, 367 U.S., at 603, 81 S.Ct., at 1879.

Schneckloth, 412 U.S. at 226.

Here, Bermeo's factual allegations regarding coercion draw a picture of a victim with a known vulnerability who was taken advantage of by the investigating officers. She alleged that she was pulled over and sexually assaulted by either a police officer or someone impersonating a police officer. She was uncomfortable going to local law enforcement under the circumstances because there was a chance that the Assailant was a legitimate law enforcement officer. During her second interview at the WCSO, the officers confiscated Bermeo's phone, keys, and wallet while they took her to the alleged crime scene. Once at the crime scene, Adkins and Roop falsely told Bermeo that they were still working to get video surveillance from the neighborhood, although they had already obtained the video.

In addition, the officers were aware that Bermeo had received text messages saying that the police "will not find anything," "U should never have gone to police," "I know where U live…where U work…everything…I would reconsider," and "Tell the police u changed ur mind and I will leave u alone…if not I won't go for you…just know that." An hour after Bermeo received the threatening text messages and reported them to Adkins, he and Roop crossed state lines and arrived at Bermeo's school to look at the messages on her phone. They then proceeded to record a 24-minute interrogation, reasonably implying that they intended to use Bermeo's statements for some purpose.[4] The officers told Bermeo they could take and "dump" her phone to find the device where the text messages originated. Bermeo alleges that the officers falsely told her that they saw video showing her car with no one following it—which she alleges was impossible because the video was from the wrong date and time and was impossible to discern any car in the video. Finally, the officers told Bermeo she was "digging" her "hole even deeper," that she needed to keep quiet to avoid embarrassment, and that they needed to keep the information between themselves. Looking at events from Bermeo's perspective, the court finds that she has plausibly alleged that she was afraid that Roop and Adkins were pressuring her to involuntarily recant her report because they had identified the Assailant as a legitimate law enforcement officer. Id. ¶ 74.

"The existence of a threat or an implied promise does not automatically render a confession involuntary." Braxton, 112 F.3d at 783. Indeed, "[v]oluntariness is not … 'to be equated with the absolute absence of intimidation,' for under this test virtually no statement

---

[4] It is unclear from the complaint whether the interrogation was "secretly" recorded or whether Bermeo knew the officers were recording the interaction. See Second Am. Compl., ECF No. 61 ¶¶ 59, 77.

would be voluntary." United States v. Pelton, 835 F.2d 1067, 1072 (quoting Wertz, 625 F.2d at 1134). "The proper inquiry is whether the confession was 'extracted' by the threats or implied promises, 'however slight.'" Braxton, 112 F.3d at 783. The pressure, in whatever form or however slight, must be "sufficient to cause the petitioner's will to be overborne and his capacity for self-determination to be critically impaired." Id. (citation modified).

Bermeo's factual allegations sufficiently allege that the detectives' statements were directed to her in a vulnerable position such that her will was overborne and she "confessed" to filing a false police report. The detectives then presented evidence of this coerced confession to the magistrate, who relied on it to issue an arrest warrant. At this stage, therefore, Bermeo has sufficiently alleged that her arrest on October 15, 2020, was made without probable cause.

**3. Effect of Conviction**

Defendants argue that Bermeo's conviction in General District Court establishes that there was probable cause for her arrest, undermining her unlawful seizure and malicious prosecution claims. Brief in Support of Mot. to Dismiss, ECF No. 64 at 7-10, citing in support Montgomery Ward & Co. v. Wickline, 188 Va. 485, 491, 30 S.E.2d. 387, 390 (1948) ("a record of conviction in a lower court is competent to show probable cause") and Rickets v. J.G. McCrory Co., 138 Va. 548, 554, 121 S.E. 916, 918 (1924) ("It is settled law in this state that conviction by a trial justice, though reversed on appeal, is conclusive evidence of probable cause, unless such conviction was procured by the defendant through fraud or by means of evidence which he knew to be false.").

However, Wickline does not stand for the proposition that a conviction in a criminal matter invalidates a civil claim for malicious prosecution. Rather, Wickline involved a lawsuit against a department store where employees reported that the defendant had stolen property, resulting in his arrest and prosecution. 188 Va. at 488-489, 50 S.E.2d at 388. The plaintiff was acquitted on criminal charges stemming from the arrest and sued the department store for false imprisonment. Wickline, 188 Va. at 487, 50 S.E.2d at 388. The court noted a difference in the effect of an acquittal on an action for false imprisonment versus an action for malicious prosecution. Id., 188 Va. at 490, 50 S.E.2d at 389. In an action for false arrest and imprisonment, the legality of the alleged arrest and detention does not depend upon the same considerations as does the subsequent disposition of the criminal complaint, and evidence of an acquittal on the criminal complaint is not relevant to the claim of false imprisonment. On the other hand, in an action for malicious prosecution, the record of acquittal is competent evidence because proof of acquittal is an essential part of the plaintiff's case. Wickline, 188 Va. at 491, 50 S.E.2d at 390. Thus, to the extent Wickline is relevant to Bermeo's lawsuit, the acquittal in the second criminal trial supports her claim for malicious prosecution.[5]

In addition, the defendants' reliance on Ricketts is misplaced because Ricketts was abrogated by statute and case law as noted in Baker v. Elmendorf, 271 Va. 474, 479-80, 628 S.E.2d 358, 361 (2006). Moreover, as the Fourth Circuit noted in the appeal of this case, in Virginia, "an appeal from a district court conviction entitles the defendant 'to a new trial in

[5] Defendants quote a line from Wickline, 188 Va. at 491, 30 S.E.2d. at 390, that "a record of conviction in a lower court is competent to show probable cause." However, that line is from a 1946 Massachusetts case, Pilos v. First Nat. Stores, 319 Mass. 475, 478, 66 N.E 576, 577 (1946), and does not reflect current Virginia law as noted in Baker v. Elmendorf, 271 Va. 474, 479-80, 628 S.E.2d 358, 361 (2006).

the circuit court' and 'annul[s] the judgment of the inferior tribunal as if there had been no previous trial.'" Bermeo, 163 F.4th at 92 n.3 (citation modified). Thus, because Bermeo was subsequently acquitted of the offense in a new trial, her first conviction in General District Court does not establish probable cause for her arrest. For the reasons set forth above, the court finds that Bermeo has stated a claim for unlawful seizure in violation of the Fourth Amendment against defendant Adkins.

The court further finds that Bermeo has stated the same claim against defendant Andis. Bermeo alleges that Adkins pursued a scheme to induce a coerced confession and subsequently made the false statements or omissions to the magistrate and that he did so at the direction of Sheriff Andis. She asserts that Andis was aware of the nature of her involuntary confession and of the evidence that was misrepresented in Adkins' investigative report but ordered Adkins to pursue the arrest anyway. Second Am. Compl., ECF No. 61 ¶¶ 81, 83-84, 140, 142-146, 150. As a factual basis for her assertion, Bermeo alleges that Detective Adkins told her that he did not want to arrest her but that his hands were tied because he was acting on orders from Sheriff Andis. Id. ¶ 91. Thus, she alleges that but for Sheriff Andis' order, Adkins would not have arrested her.

An allegation that someone "knew" something, without any supporting details to show how they came to know it, is insufficient to state a claim based on the purported knowledge. Ortegel v. Virginia Polytechnic Inst. & State Univ., No. 7:22-CV-00510, 2023 WL 8014237, at *7 n.7 (W.D. Va. Nov. 20, 2023) (citing McDaniel v. Campbell, No. 7:21-cv-649, 2022 WL 329887, at *3 (W.D. Va. Feb. 3, 2022)). However, here, Bermeo states that Adkins told her that Andis knew that her confession was involuntary and knew of the misrepresentations but

ordered her to be arrested anyway. This allegation is sufficient to withstand a motion to dismiss. Accordingly, the court finds that Bermeo has stated a cause of action against defendants Adkins and Andis on Count One and **DENIES** the motion to dismiss this count.

**B. Count Two: Malicious Prosecution in Violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983**

Bermeo brings this malicious prosecution claim pursuant to 42 U.S.C. § 1983 against Andis and Adkins, alleging that they used her involuntary coerced recantation to commence a year-long criminal proceeding against her with malice and intention to cause her harm. Second Am. Compl., ECF No. 61 ¶ 160. Counts One and Two overlap significantly, as they are brought against the same defendants and rely on many of the same factual allegations. Id. ¶¶ 155-165.

In the Fourth Circuit "there is no such thing as a '§ 1983 malicious prosecution' claim. What we termed a 'malicious prosecution' claim … is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution—specifically, the requirement that the prior proceeding terminate favorably to the plaintiff. It is not an independent cause of action." Lambert v. Williams, 223 F.3d 257, 262 (4th Cir. 2000) (quoting Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 183 (4th Cir. 2000)) (citation modified).

Thus, the claim that Bermeo calls "Malicious Prosecution in Violation of the Fourth Amendment" under 42 U.S.C. § 1983 is the type of claim that courts in the Fourth Circuit have construed as "a Fourth Amendment [unreasonable] seizure that incorporates elements of the analogous common law tort of malicious prosecution." Norton, 727 F. App'x at 764 (quoting Massey, 759 F.3d 343, 356 (4th Cir. 2014)). To state a claim for malicious prosecution

in violation of the Fourth Amendment, Bermeo must allege that Andis and Adkins "(1) caused (2) a seizure of [Bermeo] pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [Bermeo's] favor." Humbert, 866 F.3d at 555 (citing Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).

As set forth above, the court has found that Bermeo has alleged facts supporting a reasonable inference that she was arrested without probable cause. Further, Bermeo's prosecution terminated in her favor, i.e., in an acquittal following a de novo trial in the Washington County Circuit Court. See Johnson v. Ortiz, 721 F. Supp. 3d 418, 425 n.5 (E.D. Va. 2024) ("For purposes of [plaintiff]'s § 1983 claim, an indictment constitutes a seizure pursuant to legal process and an acquittal constitutes a proceeding terminated in a plaintiff's favor.")

As for causation, the Fourth Circuit has explained that constitutional torts require a showing of both but-for and proximate causation. Evans, 703 F.3d at 647. Therefore, subsequent acts of independent decision-makers, such as a prosecutor, grand jury, or judge, may serve as an intervening superseding cause that breaks the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure, and insulate a police officer from liability. Id. However, even when a prosecutor retains discretion to seek an indictment, an officer may be held to have caused the seizure and remain liable for a wrongly indicted defendant if the officer lied to or misled the prosecutor, failed to disclose exculpatory evidence to the prosecutor, or unduly pressured the prosecutor to seek the indictment. Id. at 647-48. In other words, an officer is not liable for a plaintiff's unlawful seizure following indictment unless evidence shows that the officer misled or pressured the prosecution. Id. at 648. See also

Shrewsbury v. Williams, 439 F. Supp. 3d 765, 778-79 (W.D. Va. 2020) (finding no causation in a § 1983 malicious prosecution claim against a police officer where prosecutor's decision to pursue warrants was the intervening cause for seizure in the absence of evidence that the officer misled the prosecution or concealed exculpatory evidence from the magistrate judge who issued the arrest warrants).

Here, Bermeo alleges that Andis and Adkins used her involuntary coerced recantation to commence criminal proceeding against her with malice and intention to cause harm. Second Am. Compl., ECF No. 61 ¶ 160. She makes no allegations specifically about the defendants' interactions with the prosecution or causation but avers that Andis and Adkins were the direct and proximate cause of the malicious prosecution and the injuries resulting therefrom, all of which were a reasonably foreseeable consequence of their actions. Id. ¶ 163. Based on her allegations of the scheme by which Adkins and Roop pursued a false confession, the court infers that the continued use of this confession without the alleged exculpatory evidence surrounding its validity misled the prosecution into pursuing this charge. This is sufficient to allege causation and therefore is sufficient to state a claim against Adkins.

In addition, based on Bermeo's allegation that Adkins told her that he did not want to arrest her but that his hands were tied by Andis' order to do so, she has stated a claim of malicious prosecution against Andis as well. Therefore, the court **DENIES** the motion to dismiss Count Two.

**C. Count Four: Violation of Fourteenth Amendment Right to Privacy pursuant to 42 U.S.C. § 1983**

In Count Four, Bermeo alleges that defendants Andis, Adkins, Blevins, and Roop collaboratively disclosed her identity and personal, private information in a press release for

the sole purpose of intimidating, shaming and humiliating her, violating her Fourteenth Amendment right to privacy. Second Am. Compl., ECF No. 61 ¶¶ 179, 192. She further alleges that the unnecessary disclosure of her personal information, including her full name, university, and the precise section of Charlotte, North Carolina where she lived, along with the photo Adkins took of her during her arrest, was a violation of Virginia state law, the WCSO Media Relations Policy, and the WCSO's 2020 grant agreement with Virginia for federal VAWA funding. Id. ¶¶ 181, 185, 186-191.

"Virtually every governmental action interferes with personal privacy to some degree. The question in each case is whether that interference violates a command of the United States Constitution." Katz v. United States, 389 U.S. 347, 351 n.5 (1967). Stated differently, "'[t]he question is not whether individuals regard [this] information about themselves as private, for they surely do, but whether the Constitution protects such information.'" DM v. Louisa Cnty. Dep't of Hum. Servs., 194 F. Supp. 3d 504, 508 (W.D. Va. 2016) (quoting Adams v. Drew, 906 F. Supp. 1050, 1057 (E.D. Va. 1995)).

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (internal citations omitted). "While there is no 'right of privacy' found in any specific guarantee of the Constitution," the Supreme Court "has recognized that 'zones of privacy' may be created by more specific constitutional guarantees and thereby impose limits upon government power." Paul v. Davis, 424 U.S. 693, 712-13 (1976). Those "zones" have been recognized, for example, where evidence has been seized in an unreasonable search, or where they "deal generally with

substantive aspects of the Fourteenth Amendment." Id. at 712-13 (citing Katz, 389 U.S. at 351; Terry v. Ohio, 392 U.S. 1, 8-9 (1968); Roe v. Wade, 410 U.S. 112, 152-153 (1973); Palko v. Connecticut, 302 U.S. 319, 325 (1937)). Those substantive rights "must be 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty.'" Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 231 (2022) (quoting Washington v. Glucksberg, 521 U.S. 702, 721 (1997)).[6]

The Fourth Circuit has recognized that "the constitutional right to privacy extends to the individual interest in avoiding disclosure of personal matters." Payne v. Taslimi, 998 F.3d 648, 655 (4th Cir. 2021). But that right to privacy protects only information with respect to which the individual has a reasonable expectation of privacy. Id. (citation modified).

The parties present separate theories of the case with respect to Bermeo's constitutional right to privacy. To the defendants, Bermeo was an arrestee, and personal information related to her arrest is not the subject of a privacy interest guaranteed by the Constitution. Brief in Support of Mot. to Dismiss, ECF No. 64 at 12-13. Bermeo argues that she was a victim of sexual assault, and therefore the information related to her identity and her reporting of the crime was subject to a privacy interest enshrined in "Virginia state law, WCSO Media Relations Policy, and the WCSO's 2020 grant agreement with Virginia DCJS

[6] Before Dobbs, courts recognized both a right to informational privacy, as applied in Whalen v. Roe, 429 U.S. 589 (1977), and a right to decisional privacy, as applied in Roe v. Wade. See, e.g. Doe 1 v. Cnty. of Fayette, No. 2:14-CV-00196, 2014 WL 5493814, at *2 (W.D. Pa. Oct. 30, 2014); Hester v. W. Virginia, No. 5:07-CV-00401, 2008 WL 4298471, at *16 (S.D. W. Va. Sept. 18, 2008) (citing Lambert v. Hartman, 517 F.3d 433, 440 (6th Cir. 2008)). In overturning Roe, Justice Alito distinguished between the two, opting for the application of due process to rights "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." See Dobbs, 597 U.S. at 231; Carmel Shachar & Carleen Zubrzycki, Informational Privacy after Dobbs, 75 ALA. L. REV. 1, 20 (2023). Because Bermeo's claim is one of informational privacy, Dobbs does not alter the court's analysis of her complaint.

for federal VAWA Funding." Second Am. Compl., ECF Nos. 61 ¶ 185; Brief in Opp'n to Mot. to Dismiss, ECF No. 68 at 13-14.

Generally, as defendants note, an arrestee does not have a constitutionally protected right to privacy about the facts of their arrest. Paul, 424 U.S. at 711-12, 718 (rejecting the plaintiff's argument that the defendants' dissemination of a booking photograph and arrest information to local retail stores violated his constitutional right to privacy because reputation, alone, does not implicate Fourteenth Amendment procedural due process interests in liberty or property); Siegert v. Gilley, 500 U.S. 226, 233 (1991) ("injury to reputation by itself was not a 'liberty' interest protected under the Fourteenth Amendment."); Nunez v. Pachman, 578 F.3d 228, 229 (3d Cir. 2009) (holding that the disclosure of an expunged criminal record does not violate the right of privacy afforded by the Due Process Clause, and even if a state recognizes such a privacy interest, "such an interest is not cognizable under the federal constitution"); Scheetz v. Morning Call, Inc., 946 F.2d 202, 207 (3d Cir. 1991) ("the information contained in a police report is not protected by the confidentiality branch of the constitutional right of privacy"); Sorrentino v. City of Phila., No. 96-6604, 1997 WL 597990, at *6-7 (E.D. Pa. Sept. 16, 1997) (noting that the constitutional right to privacy protects only information of a confidential and personal nature, and information relating to an individual's criminal charges is by definition public and not protected).

Bermeo counters that she should properly be considered a victim of sexual assault rather than an arrestee, and as such, she had a reasonable expectation that her identity and personal, private information would be protected from disclosure. "To demonstrate a legitimate expectation of privacy, the defendant must have a subjective expectation of

privacy." United States v. Cormack, No. ELH-19-045, 2021 WL 2187016, at *6 (D. Md. May 28, 2021) (citing United States v. Bynum, 604 F.3d 161, 164 (4th Cir. 2010) (citation modified). But the subjective expectation of privacy must also be objectively reasonable—it must be an expectation that society is willing to recognize as reasonable. Id. (citing United States v. Bullard, 645 F.3d 237, 242 (4th Cir. 2011)).

Assuming without deciding that Bermeo had a constitutional right to privacy in not having her personal information disclosed when she reported being sexually assaulted, the defendants did not disclose her information at the time she reported the assault. Rather, they disclosed the information after she was arrested for commission of a crime, albeit, as she alleges, based on a coerced confession. While she later was acquitted of the offense, as an arrestee, she did not have a constitutionally protectable interest in keeping the facts of her case private. Therefore, the issuance of the press release did not violate Bermeo's constitutional right to privacy and the court **GRANTS** the motion to dismiss with respect to Count Four.[7]

**D. Count Six: Failure to Intervene pursuant to 42 U.S.C. § 1983**

"[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Randall v. Prince George's Cnty.,

---

[7] Bermeo also argues that the press release was unlawful under "Virginia state law, WCSO Media Relations Policy, and the WCSO's 2020 grant agreement with Virginia DCJS for federal VAWA Funding." Second Am. Compl., ECF No. 61 ¶ 185; Resp. to Mot. to Dismiss, ECF No. 68 at 13-14. The court finds these arguments insufficient to support an inference that Bermeo had a reasonable expectation of privacy in the information in the press release, given that the law she cites, Virginia Code § 63.2-104.1(B)(1), applies to "programs and individuals providing services" to victims of sexual assault, including "public and not-for-profit agencies the primary mission of which is to provide services to victims of domestic violence, dating violence, sexual assault, or stalking, or victims of a violation" and does not appear to apply to the WCSO. In addition, Bermeo alleges no facts about either WCSO's media relations policy or its 2020 grant agreement with Virginia DCJS for federal VAWA funding suggesting how the press release or the disclosure of her complaint to King University violated those programs.

Md., 302 F.3d 188, 204 (4th Cir. 2002). See also id. n.24 ("[A] bystanding officer must know of his fellow officer's misconduct. The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer. If the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible."). The responsibility to intervene applies equally to supervisory and nonsupervisory officers. Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994) (citing Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972)).

Bermeo alleges that Andis, Adkins, Blevins, and Roop each knew of the others' violations of Bermeo's constitutional rights, had a reasonable opportunity to prevent that harm, and failed to intervene. Second Am. Compl., ECF No. 61 ¶¶ 209-212. As concerns Blevins, Bermeo did not allege facts showing that he had any knowledge of the interrogation on her college campus or that he participated in the decision to arrest her for falsifying a police report. The only factual allegation against him is that he was present when Bermeo was initially interviewed after reporting the assault. Id. ¶¶ 27-31, 35. Her allegation that he knew of the second interrogation and subsequent arrest because he was Adkins' supervisor is conclusory and insufficient to state a claim. Accordingly, defendants' motion to dismiss this claim against Blevins is **GRANTED**.

However, regarding the remaining defendants, Adkins, Roop, and Andis, Bermeo has alleged facts sufficient to state a claim. She asserts that Adkins and Roop both were present when they interviewed her and forced her to confess that she had fabricated the crime. And she alleges that Adkins told her that he did not want to arrest her but was doing so on Andis'

order. Accordingly, she sufficiently alleges that the three defendants had an opportunity to intervene and did not, and the court **DENIES** the motion to dismiss with respect to defendants Adkins, Andis, and Roop.

**E. Count Seven: Failure to Supervise pursuant to 42 U.S.C. § 1983**

A claim for supervisory liability under § 1983 requires a showing of three elements: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citation modified). See also Gemaehlich v. Johnson, No. 7:12CV00263, 2013 WL 589234, at *3 (W.D. Va. Feb. 14, 2013) ("[Plaintiff] still must allege sufficient facts for the court to conclude that he has 'shown' that [the supervising defendant] knew of a pervasive and unreasonable risk of constitutional injury and failed to act under circumstances that give rise to an inference of deliberate indifference.") A supervisor may be liable in his individual capacity if he knows about his subordinates' misconduct and facilitates it, approves it, condones it, or turns a blind eye to it. Cranford v. Frick, No. 1:05CV00062, 2007 WL 676687, at *5–6 (M.D.N.C. Feb. 28, 2007) (citing Jones v. Chicago, 856 F.2d 985, 992 (7th Cir. 1988)).

Bermeo alleges that Sheriff Andis knew of the other defendants' constitutional transgressions and his response to these violations was so inadequate as to show deliberate indifference both because he failed to follow his own policies, and because he actively

participated in violating Bermeo's Fourth and Fourteenth Amendment Rights. Second Am. Compl., ECF No. 61 ¶¶ 213-216.[8]

In addition, Bermeo alleges that Adkins told her that Sheriff Andis had ordered him to arrest her for knowingly filing a false police report with intent to mislead law enforcement when he knew the officers had coerced her to confess. At this stage of the proceedings, Bermeo's allegation that Andis failed to supervise the officers in their decision to coerce her to confess and present the coerced confession to the magistrate is sufficient to allow her to proceed on her failure to supervise cause of action. The motion to dismiss Count Seven on this basis is **DENIED**.

In addition, Bermeo alleges that Andis had issued the WCSO Sexual Assault Policy which set forth procedures for investigating allegations of sexual assault but failed to follow the policy. However, to the extent Bermeo is arguing that Andis (or any of the defendants) violated her rights by failing to adequately investigate her allegations of sexual assault, she fails to state a claim, as there is no constitutional right to have police investigate a crime. Sattler v. Johnson, 857 F.2d 224, 227 (4th Cir. 1988). See also Brown v. Washington, No. 2:21-00037-BHH-MHC, 2021 WL 1430912, at *3 (D.S.C. Mar. 22, 2021) (quoting Rossi v. City of Chicago, 790 F.3d 729, 735 (7th Cir. 2015) and citing DeShaney v. Winnebago v. Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1980)) ("[A] victim of a crime 'does not have a constitutional right to have the police investigate his case at all, still less to do so to his level of satisfaction.'");

[8] The court notes that Counts Seven and Eight are not respondeat superior claims under Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658 (1978), and the WCSO is not a defendant in the lawsuit. Rather, Bermeo is asserting that Sheriff Andis is individually liable in a supervisory capacity for violation of her civil rights based on his own conduct directing officers to perform a shoddy investigation of her claims and then arrest her without probable cause based on a coerced confession. See discussion, Armstrong v. City of Greensboro, 190 F. Supp. 3d 450, 463–69 (M.D.N.C. 2016).

Williams v. Commonwealth's Attorney Office, No. 7:19-cv-312, 2020 WL 411699 (W.D. Va. Jan. 24, 2020) (dismissing § 1983 claim alleging violation of civil rights by the Commonwealth's Attorney Office and a local sheriff's department for failure to investigate allegations because plaintiff had "no legally significant interest in the criminal investigation or prosecution of the individuals who he claims committed crimes against him.").

The motion to dismiss Count Seven is **GRANTED** to the extent that it is based on Bermeo's claim that Andis failed to supervised the investigation of her sexual assault claim.

**F. Count Eight: Failure to Train pursuant to 42 U.S.C. § 1983.**

Bermeo alleges that Sheriff Andis failed to train the other defendants on the WCSO Sexual Assault Response Policy, failed facilitate the trainings that he promised to give in exchange for VAWA funding, and failed to train defendants on the WCSO Media Relations Policy and any VAWA-related guidance, thus causing Bermeo's injuries. Second Am. Compl., ECF No. 61 ¶¶ 229-241.

Bermeo claims that Andis issued the WCSO Sexual Assault Response Policy and the document "requires that deputies and office personnel be trained on and knowledgeable about sexual assault investigations and their impact on victims and the appropriate communication skills to use when interacting with victims of sexual assault." Id. ¶ 127. She further claims that Blevins, Adkins, and Roop all stated that they did not receive any training on investigating sexual assaults or communicating with sexual assault victims. Id. ¶ 128. She asserts that the stated purpose of the policy is to undertake diligent investigations in order to increase the reporting of sexual assault crimes and that Andis exhibited a history of deliberate indifference

and refusal to follow his own policy. She contends that Andis' deliberate indifference affirmatively caused Plaintiff's constitutional injuries. Id. ¶ 221.

However, as set forth above, Bermeo has no constitutionally protected interest in having the allegations of sexual assault investigated in a particular manner. In the absence of such a constitutional interest, she cannot state a claim that failure to train officers on investigative techniques violates her constitutional rights. Accordingly, the motion to dismiss Count Eight is **GRANTED** and this claim is **DISMISSED**.

**G. Count Ten: Intentional Infliction of Emotional Distress under Virginia law.**

In her last remaining claim, Bermeo alleges that all four defendants are liable for intentional infliction of emotional distress (IIED) under Virginia law. To establish a claim for IIED in Virginia, a plaintiff must show "'(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and (4) the resulting emotional distress was severe.'" Carter v. Khan, No. 1:15-CV-00572 JCC, 2015 WL 6738607, at *13 (E.D. Va. Nov. 4, 2015) (quoting Supervalu, Inc. v. Johnson, 276 Va. 357, 370, 666 S.E. 2d 335, 343 (2008)). "[S]substantive claims for intentional infliction of emotional distress under Virginia law 'need not be pled [in federal court] with the degree of specificity required by Virginia courts.'" Faulkner v. Dillon, 92 F. Supp. 3d 493, 500 (2015) (quoting Nelson v. Green, No. 3:06-cv-070, 2014 WL 131055, at *14 (W.D. Va. Jan. 14, 2014)). Pleadings are sufficient when they provide a short and plain statement, which, if accepted as true, allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 500-01.

First, as set forth above, the only factual allegations against Blevins are that he was present the first time Bermeo went to the WCSO and reported the sexual assault to the officers. The remainder of her allegations against him are conclusory rather than factual. Accordingly, the allegations Bermeo makes against Blevins do not state a claim for IIED and are **DISMISSED**.

Regarding the remaining defendants, the first element of an IIED claim "is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result." Womack v. Eldridge, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974). Bermeo alleges that Roop and Adkins intentionally sought to coerce a confession in the absence of probable cause, deliberately taking advantage of Bermeo's known vulnerabilities to establish cause to arrest her. Bermeo also alleges that the defendants collaborated to publish a press release publicizing her arrest, which they knew was made without probable cause, to "publicly intimidate, shame, and humiliate [her] for lying to law enforcement about being sexually assaulted." Second Am. Compl., ECF No. 61 ¶ 6. The court finds that Bermeo alleges sufficient deliberation on the part of Roop, Adkins, and Andis to support a reasonable inference of intent. See, e.g. Greene v. Putnam Cnty. Comm'n, No. CV 3:21-0520, 2022 WL 16859739, at *11 (S.D. W. Va. Nov. 10, 2022) ("In the Court's view, fabricating evidence signals intent sufficient 'to state a claim to relief [for IIED] that is plausible on its face.'")

To establish the second element, the plaintiff must allege actions "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Harris v. Kreutzer,

271 Va. 188, 204, 624 S.E. 2d 24, 33 (2006). The court determines in the first instance whether the defendant's conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery[.]" Id. (quoting Womack, 215 Va. at 342, 210 S.E.2d at 148. "[T]he term 'outrageous' does not objectively describe particular acts but instead represents an evaluation of behavior." Almy v. Grisham, 273 Va. 68, 78, 639 S.E.2d 182, 187 (2007) (citing Russo v. White, 241 Va. 23, 26, 400 S.E. 2d 160, 162 (1991)).

Bermeo alleges that the defendants set out to make it look like she was lying about the sexual assault. She claims that they intentionally fabricated evidence to coerce her into making an involuntary false confession, collaborated to issue a press release for the sole purpose of intimidating, shaming, and humiliating her, reported her alleged crime to university officials with no justification for doing so, and used the coerced involuntary confession to persuade the magistrate to issue an arrest warrant charge her with reporting a false crime. Other courts have found that a police officer's use of their power to fabricate a false confession was extreme and outrageous. See, e.g., Carpenter v. Reed, No. 5:14-CV-16, 2015 WL 4979635, at *15 (W.D.N.C. Aug. 19, 2015) (finding that if defendants falsified allegations in an arrest warrant, their conduct would be sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress); Cf. Davis v. Bacigalupi, 711 F. Supp. 2d 609, 621 (E.D. Va. 2010) (holding that allegations that a detective lied to a magistrate in an affidavit was "sufficiently conscience-shocking" for purposes of stating a claim for violation of the right to substantive due process); and Almy, 273 Va. at 77-78, 639 S.E.2d at 187 (finding plaintiff stated an IIED claim against non-law-enforcement defendants who falsely accused her of writing threatening letters and manufactured evidence against her that they presented to law

enforcement officers with the specific purpose of causing her humiliation, ridicule, and severe emotional distress).

"Notably, no objective, bright-line rule exists for what conduct rises to the requisite level of outrageousness." Williams v. AM Lapomarda, No. 3:19CV631 (DJN), 2020 WL 3643466, at *15 (E.D. Va. July 6, 2020) (citing Almy, 273 Va. at 81, 639 S.E. 2d at 189 ). "Thus, the Court should dismiss Plaintiff's IIED claim only if reasonable minds could not differ on the outrageousness question." Id. (quoting Womack, 215 Va. at 342). The court finds that Bermeo has satisfied this requirement as reasonable minds could differ on the question of whether the actions alleged by Bermeo to have occurred were outrageous. This is particularly true here given the sensitive nature of sexual assault cases and investigations, the nature of the alleged coercion in this case, the publication of Bermeo's arrest both to the public and to officials at her university, and her subsequent prosecution.

For the third element, the plaintiff must show a causal connection between the wrongdoer's conduct and the emotional distress she suffered. Womack, 215 Va. at 342, 201 S.E.2d at 148. Bermeo alleges that she was afraid that Adkins and Roop were pressuring her to recant her claim of sexual assault because they had determined that the person who assaulted her was a police officer. She further claims that after defendants prepared and disseminated the press release she received hundreds of cruel and hurtful messages on social media, including people telling her that she belonged in jail and should kill herself. The defendants' report of Bermeo's arrest to officials at King University resulted in an official telling Bermeo that she was facing expulsion and would be subject to an official investigation

and disciplinary proceeding. These allegations are sufficient to show a causal connection between the defendants' conduct and the emotional distress that Bermeo suffered.

And fourth, the emotional distress must be so severe that "no reasonable person could be expected to endure it." Harris, 271 Va. at 205, 624 S.E.2d at 34 (citation modified). Defendants argue that Bermeo's IIED claim fails to sufficiently allege the fourth element, citing in support Harris, 271 Va. at 205, 624 S.E. 2d 24 at 34; Russo, 241 Va. at 28, 400 S.E. 2d at 163; and Cole v. Oakey, 101 Va. Cir. 288, 294 (Roanoke Cnty. 2019)). ECF No. 64 at 23.[9]

In Russo, the Virginia Supreme Court found that a plaintiff's claims that "she was nervous, could not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was unable to concentrate at work" were insufficient to state a claim, in part because she did not allege "any objective physical injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income." Russo, 241 Va. at 28, 400 S.E.2d at 163. Here, Bermeo alleges that she sought professional counseling because she has frequent thoughts of suicide, including suicidal ideation, and initially was unable to drive, could not return to school, could not work, could not be home alone, and could not sleep without having terrifying and panic-inducing nightmares. She continues to struggle with driving, sleeping, and being home alone. In addition, she alleges that defendants' misconduct derailed her career path because she had dreams of working as a federal law enforcement officer but now feels lost and paralyzed with fear.

---

[9] Defendants also argue that the court should dismiss Bermeo's IIED claim because "the initiation of criminal proceedings when there is probable cause to do so cannot constitute the intentional infliction of emotional distress." Because of the court's findings with respect to probable cause, this argument is not persuasive.

At the motion to dismiss stage, this is sufficient to state a claim of IIED. See Almy, 273 Va. at 80, 639 S.E. 2d at 188 (finding that a claim sufficiently alleged severe emotional distress where the plaintiff alleged both that she required counseling and that she was incapable of carrying out her work or family responsibilities). Accordingly, the court **DENIES** the motion to dismiss the IIED claim with respect to defendants Roop, Adkins, and Andis.

**H. Qualified Immunity**

Defendants also argue that Bermeo's constitutional claims are barred by qualified immunity, which applies where their conduct does not violate a clearly established right of which a reasonable person would have known. Brief in Support of Mot. to Dismiss, ECF No. 64 at 20.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The inquiry for determining whether a government official is protected by qualified immunity is two-pronged: the court must determine (1) whether the defendant's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged violation. Nazario v. Gutierrez, 103 F.4th 213, 230 (4th Cir. 2024) (citations omitted). "[C]ourts have discretion to begin with either prong of the qualified immunity analysis." Rambert v. City of Greenville, 107 F.4th 388, 398 (4th Cir. 2024) (citing Pearson, 555 U.S. at 236).

"Ordinarily, the question of qualified immunity should be decided at the summary judgment stage." Willingham v. Crooke, 412 F.3d 553, 558 (4th Cir. 2005). However, the

Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation" in order "to protect public officials from the 'broad-ranging discovery' that can be 'particularly disruptive of effective government.'" Anderson v. Creighton, 483 U.S. 635, 646 n.2 (1987) (quoting Harlow, 457 U.S. at 817-18).

As set forth above, the court found that Bermeo's allegations in Counts One, Two, Six, and Seven against defendants Adkins, Roop, and Andis state plausible constitutional claims. Thus, the remaining analysis requires the court to assess whether that right was "clearly established" at the time of the alleged violation.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). "[C]ourts in this circuit ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) (citation modified) (quoting Jean v. Collins, 155 F.3d 701, 709 (4th Cir. 1998)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix, 577 U.S. at 11 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). In other words, "[c]learly established … includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Gilliam, 932 F.3d at 235 (quoting Iko v. Shreve, 535 F.3d 225, 240 (4th Cir. 2008)). Thus, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Id. at 229 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

"There can be no reasonable dispute that it was clearly established … that an arrest in the absence of probable cause was a violation of an individual's Fourth Amendment rights, and that a coerced confession could not form the basis of probable cause for an arrest." Gilliam, 932 F.3d at 235. Therefore, Bermeo's claims based on her allegation that defendants Roop, Adkins, and Andis coerced her into confessing to a crime she did not commit and then used the coerced confession to obtain an arrest warrant based on the false charges allege a violation of a clearly established right of which a reasonable official would have known. As such, at least at the pleading stage, Counts One, Two, Six, and Seven are not subject to dismissal based on qualified immunity.

**III. Conclusion**

For the reasons stated herein, the court **GRANTS in part** and **DENIES in part** defendants' motion to dismiss, ECF No. 63, as follows:

1. The court **DENIES** the motion to dismiss Counts One and Two;
2. The court **GRANTS** the motion to dismiss Count Four;
3. On Count Six, the court **GRANTS** the motion to dismiss with respect to defendant Captain Jamie Blevins and **DENIES** the motion to dismiss with respect to the remaining defendants;
4. On Count Seven, the court **DENIES** the motion to dismiss insofar as it alleges defendant Andis failed to supervise the other defendants in their actions related to the alleged forced confession and arrest without probable cause. The court **GRANTS** the motion to dismiss insofar as it is based on an alleged failure by Andis to train his subordinates on how to investigate sexual assault claims;

5. The court **GRANTS** the motion to dismiss Count Eight;

6. On Count Ten, the court **GRANTS** the motion to dismiss with respect to defendant Captain Jamie Blevins and **DENIES** the motion to dismiss with respect to defendants Detective Scott Adkins, Detective Brad Roop, and Sheriff Blake Andis.

7. Defendant Captain Jamie Blevins is **DISMISSED** as a defendant.

Additionally, based on the stipulations of the parties, Counts Three, Five, Nine and Eleven are **DISMISSED without prejudice**.

An appropriate order will be entered.

Entered: September 29, 2026

Michael F. Urbanski
U.S. District Judge
2026.09.29 17:41:18
-04'00'

Michael F. Urbanski
Senior United States District Judge